717 S.E.2d 873

### In re CECIL T.

### No. 35659.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 2011.

Decided March 10, 2011.

Jane Moran, Jane Moran Law Office, Williamson, WV, for Appellants.

L. Donna Pratt, Logan, WV, Guardian Ad Litem.

David A. Wandling, Avis, Witten & Wandling, Logan, WV, for Appellee.

Michael L. Jackson, Assistant Attorney General, Charleston, WV, for West Virginia, Department of Health & Human Resources.

McHUGH, Justice:

This matter involves the petition for appeal of Brett and Susan B.[1] [hereinafter "Appellants"] of the January 29, 2010, order of the Circuit Court of Logan County, as intervenors[2] and foster parents in the underlying

---

1. In keeping with our traditional treatment of cases involving sensitive facts, parties will be identified by using the first initial of last names rather than full surnames. *See e.g., In re Abbigail Faye B.*, 222 W.Va. 466, 470 n. 1, 665 S.E.2d 300, 304 n. 1 (2008); *West Virginia Dept. of Human Services v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985).

2. See Syl. Pt. 1, *In re Harley C.*, 203 W.Va. 594, 509 S.E.2d 875 (1998) ("Foster parents who are

abuse and neglect proceeding regarding the infant Cecil T. II [hereinafter "Cecil T."].[3] In that order, the circuit court denied the motion to terminate the parental rights of Cecil T. I [hereinafter "father" or "Appellee"] made by the West Virginia Department of Health and Human Resources [hereinafter "DHHR"], in which Appellants and the guardian ad litem of Cecil T. had joined. Appellants maintain that the lower court erred by not promoting the best interests of Cecil T. when it failed to terminate the father's parental rights and thereby delayed the establishment of a permanent placement plan for the child.[4] Having completed a thorough review of the arguments, including the response and report filed by the child's guardian ad litem, as well as the appellate record and relevant law, we reverse the decision of the lower court and remand the case for entry of an order terminating the father's parental rights and establishment of a permanent placement plan for Cecil T.

### I. Factual and Procedural Background

Cecil T. was born on September 6, 2008. On September 9, 2008, DHHR filed the first abuse and neglect petition[5] with the circuit court seeking immediate legal and physical custody of the infant. It is uncontested that the original removal petition stated that the child was in imminent danger of abuse and neglect because: the parental rights of the biological mother had been involuntarily terminated with regard to two other children she had birthed; the baby was found presumptively positive for benzodiazepines, methadone and barbiturates; and the father had admitted to use of a drug while felony drug charges were pending against him in

magistrate court.[6] The petition related that no willing or physically able relatives were found to care for the child. The resulting emergency order placed legal custody of Cecil T. with DHHR and physical custody with Appellants.

At a hearing in November 2008, Appellee was awarded a pre-adjudicatory improvement period after he advised the court that he and the mother were no longer living together as a couple. The mother's parental rights were terminated[7] at an adjudication hearing held on December 9, 2008, but the custody of the child remained unchanged with DHHR continuing to have legal custody and Appellants retaining physical custody.

At a February 9, 2009, hearing, the lower court determined that Appellee had substantially complied with the terms of his improvement period and that the conditions which led to the filing of the first abuse and neglect petition had abated. As a result, the court returned legal and physical custody of the then 5–month–old Cecil T. to his father on that date. Appellants represent that this decision was reached despite Appellee's admission to the court at the December 2008 adjudication hearing that he violated the terms of the improvement period by co-habitating for a short time with the baby's mother. Appellants also said that the guardian ad litem expressed concern during the February 9, 2009, hearing not only about the continuing relationship between Cecil T.'s parents, but also about the father's abnormal drug screens which occurred on days when the baby was in the father's physical custody, and the lack of alternative care givers if

granted standing to intervene in abuse and neglect proceedings by the circuit court are parties to the action who have the right to appeal adverse circuit court decisions.")

3. It was established during the oral argument that Cecil T. was then 28 months old.

4. DHHR as respondent in this matter has indicated by letter and during participation in the oral presentation of this case that it fully concurs with Appellants' arguments and position in this appeal. The guardian ad litem for the infant offers her support in equal measure.

5. The first abuse and neglect petition is not in the record of the current case file.

6. Appellee indicated in his brief that the felony charges against him were dismissed. However, the transcript of the dispositional hearing reveals that the State dismissed the criminal complaint for cultivation of marihuana in magistrate court so that it could pursue bringing the charge by grand jury indictment. According to the transcript, Appellee ultimately pled guilty to this charge for which he received a sentence of one to five years to serve concurrently with a federal possession of firearms charge explained in more detail later in this opinion.

7. This termination was not appealed.

Appellee were to be placed in jail as a result of the indictment pending against him.[8]

On March 6, 2009, Appellee was arrested in his home for selling firearms to undercover agents in violation of federal law barring possession of firearms by a convicted felon.[9] The indictment contains a list of six firearms which Appellee had in his possession. Cecil T. was present in the home at the time of the sale and arrest. While it is not entirely clear how it occurred, the child apparently was taken to the home of Appellee's mother, Verna M. when Appellee was arrested, and the child remained there for three days.

According to DHHR's March 9, 2009, "Petition for Immediate Custody of Minor Children in Imminent Danger," a DHHR child protective service worker [hereinafter "CPS"] responded on that date to a call from the grandmother's home where upon arrival at the home she found Cecil T. The conditions discovered in the home related by the CPS worker in this second abuse and neglect petition included that the grandmother had no appropriate bedding for the infant and the child was found lying in a playpen wearing a urine soaked diaper. It was further noted in the petition that the grandmother herself appeared to be in respiratory distress, but she refused the offer of the worker to call 911.[10] The petition also related that the father had assumed physical and legal custody of the child following the successful completion of an improvement period in a prior abuse and neglect proceeding, but that the father was no longer available to care for the child due to the father's arrest and incarceration on March 6, 2009, for federal firearms charges.

By the court's March 9, 2009, "Emergency Order for Removal of Children in Imminent Danger," the legal and physical custody of Cecil T. was returned to DHHR. On July 24, 2009, DHHR submitted an "Amended Petition," in which the agency reasserted all of the points of the March 9, 2009, petition for immediate custody, and further stated that the father had been indicted in federal court for sale of firearms and had entered into a plea agreement regarding the federal charges.

An adjudication hearing was held on July 27, 2009. As a result, the lower court entered an order on August 11, 2009, in which it found that Appellee "knowingly participated in illegal activities while the child was present which led to his arrest and subsequent plea" to federal criminal charges and that his "actions placed the child at a substantial risk and in imminent danger. His choices placed the child in a very risky situation." The order further states that "by his own actions, [the father] has been incarcerated and is unable to care for the child." The order then reflects the lower court's ultimate determination that clear and convincing evidence was presented to establish that Cecil T. was a neglected child. The order goes on to relate that DHHR was unable to employ reasonable efforts to reunify the infant with his father due to the father's incarceration, and that custody of the infant would continue with DHHR.[11]

Appellants' motion to intervene was filed in the court on August 24, 2009. In their motion, Appellants advised the court that they were Cecil T.'s foster parents and had served as such for all but three weeks of the life of the then 11–month–old infant. They also represented that they were prepared to offer testimony regarding the child's demeanor during and following visitation with Cecil T, as well as provide information regarding the baby's development and general state of health and well-being. Additionally, they requested to be considered as potential adoptive parents for Cecil T.

A dispositional hearing was held on October 28, 2009, at which Appellants' motion to intervene was granted. A motion for termination of the father's rights made by DHHR,

---

8.  See n. 6 *supra.*

9.  The federal indictment accompanying Appellant's brief notes that Appellee had been convicted of felony breaking and entering in 1992.

10. According to the March 9, 2009, petition, the court had previously found that the grandmother

would not be an appropriate caretaker due to her ongoing serious health problems.

11. It is undisputed that the child was returned to the care and physical custody of Appellants after the emergency removal petition was granted.

and joined in by the guardian ad litem of Cecil T. and Appellants, was entertained. The motion was made on the basis that the conditions necessitating emergency removal of the legal and physical custody of the child from the father could not be corrected in the near future. The facts asserted in support of termination included the father's history of criminal activity and pending incarceration, the father's failure to protect the child and provide him with the care necessary to ensure his health and well-being while Cecil T. was in the father's physical care, and the father's past failure in complying with the goals of an improvement period. The father countered by arguing that the sole allegation against him was his incarceration which is an insufficient basis for terminating parental rights pursuant to *In re Brian James D.*, 209 W.Va. 537, 550 S.E.2d 73 (2001).

At the conclusion of the hearing, the lower court denied the motion to terminate, with the court inferentially agreeing with the father's argument that parental rights could not be terminated on the sole basis of incarceration. In its January 29, 2010 order, the lower court concluded:

> The WVDHHR has failed to establish by clear and convincing evidence elements for termination. Additionally, the WVDHHR [h]as failed to prove by clear and convincing evidence that there is no reasonable likelihood that the conditions that led to the finding of neglect could be corrected after ... [the father] is released from prison.... At the time of ... [the father's] release from prison, should he wish to make a record that he is fit to resume exercising his parental rights, the appropriate forum to make such a record is in Family Court.

The order further assigned Appellants as the legal guardians of Cecil T., and provided that the child remain in the physical custody of Appellants while DHHR retain his legal custody. Finally, the order reflects the finding that the best interests of the child would not be served by visitation with the father while he was incarcerated.

It is from the January 29, 2010, order that Appellants petitioned this Court for review, and for which appeal was granted by order dated June 22, 2010.

## II. Standard of Review

A compound standard of review is applied in appeals resulting from abuse and neglect proceedings. *In re Emily*, 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000). That compound standard is summarized in syllabus point one of *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), in the following manner:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

It is with these considerations in mind that we approach the issues raised in this appeal.

## III. Discussion

Appellants maintain that the lower court erred by not terminating the parental rights of Appellee pursuant to West Virginia Code § 49-6-5(a)(6) because the failure to terminate does not provide a meaningful permanency plan for Cecil T., and wrongly places the father's parental rights above that of the best interests of the child. They point to the lower court's order which they maintain essentially places the child's permanency plan on hold until the father is released from prison and the father determines if he wants "to make a record that he is fit to resume exercising his parental rights."

Appellee argues the lower court was correct in its decision because the sole ground proposed for terminating his parental rights

was his incarceration. He claims that the lower court simply followed the law as stated in syllabus point two of *State ex rel. Acton v. Flowers*, 154 W.Va. 209, 174 S.E.2d 742 (1970), that "[a] natural parent of an infant child does not forfeit his or her parental right to the custody of the child merely by reason of having been convicted of one or more charges of criminal offenses." According to Appellee, this holding as stated in *In re Brian James D.*, 209 W.Va. 537, 550 S.E.2d 73 (2001), means that "incarceration, *per se,* does not warrant the termination of an incarcerated parent's parental rights ... [although it] may be considered along with other factors and circumstances impacting the ability of the parent to remedy the conditions of abuse and neglect." *Id.* at 540–41, 550 S.E.2d at 76–77. Appellee further maintains that a meaningful permanency plan exists for Cecil T. in that he has been placed in the guardianship of Appellants in accord with West Virginia Code § 49-6-5(a)(5) which provides that upon a finding that the abusing parent or parents are presently unwilling or unable to provide for the child's needs, commit the child temporarily to the custody of the state department, a licensed child welfare agency, or a suitable person who may be appointed guardian by the Court.

The dispositional phase of child abuse and neglect proceedings is governed by West Virginia Code § 49-6-5 (2006), which provides a number of alternatives the court may consider, with precedence given to the least restrictive alternative appropriate to the circumstances of a case. The disposition as ordered in this case is reflected in West Virginia Code § 49-6-5(a)(5), which provides in pertinent part:

> Upon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the custody of the state department, a licensed private child welfare agency or a suitable person who may be appointed guardian by the court.

The more restrictive alternative disposition of termination of parental rights sequentially follows this provision in the statute at West Virginia Code § 49-6-5(a)(6), which states in part:

> Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child, terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the department or a licensed child welfare agency.

The phrase "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" is defined later in subsection (b) of the statute as meaning that "based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." Thereafter the statute contains a nonexclusive list of examples where no reasonable likelihood for correction is deemed to exist.

The following excerpt from the transcript of the dispositional hearing on which the January 29, 2010, dispositional order is based reflects the lower courts' express reasoning for not terminating the father's parental rights.

> The grounds for removal of course are serious in that the Adult Respondent was a convicted felon and was selling guns out of the home where he had custody of the child. That child had only been there for a short period of time and I don't find any strong emotional bond that existed based upon solely the age of the child. He was less than a year old when the removal took place I believe.
>
> The Department has failed to establish by clear and convincing evidence grounds for termination. I believe the appropriate finding to be made at this time is under 49-6-5 where the parents are unable to provide adequately for the child's needs, the child can be assigned a guardian and I will name the Intervener's [sic] as guardians for the child, to make all relevant decisions about the child's welfare.
>
> The Department has failed to prove by clear and convincing evidence that there is

no reasonable likelihood that the conditions that led to the finding of neglect could be corrected after [the father] ·is released from prison. If he stops selling guns out of his house then he may otherwise be able to establish himself as a person to visit and/or resume custody of this child. But that is for another day and another time. This limbo period in between is not contemplated by the statu[t]e, recognized by the Court in these cases involving where one or both parents are incarcerated.

So I believe not [the] disposition as defined in 49–6–5 but the Order in this case should be that [Cecil T.] be made the ward of the Intervener's [sic] and at the time of [the father's] release, should he wish to make a record that he is fit to resume exercising his parental rights, that he could do so in the appropriate Family Court.

Appellants maintain that the denial of the motion to terminate was based on an incorrect application of the statutory time period in which correction to the conditions of neglect or abuse had to occur. The standard for termination under the statute is proof that the conditions of neglect or abuse could not be "substantially corrected in the near future." W.Va.Code § 49–6–5(a)(6). Essentially, Appellants argue that the lower court wrongly determined that "in the near future" for a person who is incarcerated is not until after the person is released from incarceration. *Id.*

It appears that the ruling of the lower court in question is influenced by Appellee's reasoning. Appellee correctly states the law as set forth in *State ex rel. Acton v. Flowers:* **conviction** of a criminal offense or offenses, standing alone, is not a sufficient basis upon which parental rights may be terminated. However, Appellee relies on the following statement appearing in the per curiam opinion of *In re Brian James D.,* seemingly restating the *Acton* holding as: "In other words, **incarceration,** *per se,* does not warrant the termination of an incarcerated parent's parental rights." 209 W.Va. at 540, 550 S.E.2d at 76. Incarceration was not at issue in *Acton.*[12] Additionally, incarceration is not a synonym for conviction, and this Court has never held that incarceration can not be the sole basis for terminating parental rights. We deem this dicta in *Brian James D.* to be unsound, not only because incarceration had no bearing on the facts under consideration in that case,[13] but also because a later reference in the opinion to the same premise correctly reflects "our case law holding that a criminal conviction *per se* does not warrant the termination of parental rights." *Id.* at 541, 550 S.E.2d at 77.

■ This Court has addressed incarceration as a consideration in deciding termination of parental rights in the case of *In re Emily,* wherein we stated that:

[this Court has] been reluctant to find that incarceration, *per se,* warrants the termination of an imprisoned parent's parental rights.... Instead, we have cautiously ac-

---

**12.** The mother in *Acton* was not incarcerated when she sought to regain physical custody of the child, and it was never alleged that she had abused or neglected her child. The child was born to the unwed mother while she was serving a prison sentence and the mother chose to place the child with what is now DHHR on a temporary basis so that the needs of the child would be properly attended to while she completed her prison term. The temporary transfer of the physical custody was memorialized in a written agreement between the agency and the mother. When the mother was released from prison, she sought to have the child returned, but the foster parents who had separately contracted with DHHR to provide care for the child refused to relinquish the child to the agency. The mother then sought relief by petitioning the court for a writ of habeas corpus. Among the matters raised by the foster parents challenging the fitness of the birth mother to have the child re-

turned to her was that she had been arrested a number of times in various states with four of these arrests involving convictions for felony offenses. The Court in *Acton* relied on the premise that a natural mother who has not been proven to be an unfit parent is entitled to custody of her child unless the right to custody had been validly transferred in a manner recognized by law. Rather than finding the mother as unfit due to her numerous arrests and convictions, the Court found that the mother in *Acton* had not forfeited her "parental right to the custody of the child merely by reason of having been convicted of one or more charges of criminal offenses." Syl. Pt. 2, in part, *Acton.*

**13.** The parental rights in *Brian James D.* had been terminated solely because of the father's *arrest* for delivery of marihuana, not because he was or even would be incarcerated.

knowledged that while certain incidences of incarceration certainly are more egregious than others and should be considered when contemplating the termination of parental rights, "[a] natural parent of an infant child does not forfeit his or her parental right to the custody of the child merely by reason of having been convicted of one or more charges of criminal offenses." Syl. pt. 2, *State ex rel. Acton v. Flowers*, 154 W.Va. 209, 174 S.E.2d 742 (1970) (emphasis added).

Thus, while an individual's incarceration may be *a* criterion in determining whether his/her parental rights should be terminated, other factors and circumstances impacting his/her ability to remedy the conditions of abuse and neglect should also be considered when making such a disposition.

208 W.Va. at 341–42, 540 S.E.2d at 558–59.

■ Although we have not adopted a *per se* rule regarding the impact incarceration has on a termination of parental rights decision, we have likewise not said that the facts surrounding a parent's incarceration may never form the basis for terminating parental rights. Because incarceration does not *automatically* result in termination of a person's parental rights does not mean it may not affect the decision regarding permanent placement of a child. The reasons underlying the incarceration as well as the terms and conditions of incarceration can vary greatly. In some cases, a parent who is incarcerated may under the circumstances still be able to correct conditions of abuse and neglect "in the near future" through participation in an improvement period or otherwise. In other cases, incarceration may unreasonably delay the permanent placement of the child deemed abused or neglected, and the best interests of the child would be served by terminating the incarcerated person's parental rights. Thus while the mere fact that someone is incarcerated will not result in automatic termination of parental rights, the parental rights of an incarcerated person may be terminated. Accordingly, when no factors and circumstances other than incarceration are raised at a disposition hearing in a child abuse and neglect proceeding with regard to a parent's ability to remedy the condition of abuse and neglect in the near future, the circuit court shall evaluate whether the best interests of a child are served by terminating the rights of the biological parent in light of the evidence before it. This would necessarily include but not be limited to consideration of the reason for the incarceration, the nature of the offense for which the parent is incarcerated, the terms of the confinement, and the length of the incarceration in light of the abused or neglected child's best interests and paramount need for permanency, security, stability and continuity.

■ Here, the father's incarceration and terms thereof established Appellee's inability to correct the conditions of abuse and neglect in the near future and could have served as the basis for termination of parental rights. Furthermore, additional relevant facts supporting termination were before the court in this case. The father had been awarded custody of the five-month-old infant following an improvement period granted in the initial abuse and neglect petition. Nonetheless, his decision-making during the brief time the child was in his custody—a mere 26 days— shows an abject disregard for the child's general well-being. His actions actually put the child's health, welfare and safety squarely at risk. He possessed a number of firearms when he knew that he was prohibited by law from having guns, and thus jeopardized his ability to care for the infant. He knew he could be arrested for having firearms, and he knew if he were arrested there were no other family members located by DHHR who could or would care for the infant in his stead. Additionally, Appellee kept the guns in the home where the child was living and the actual sale of the deadly weapons occurred in the baby's presence. Once Appellee was arrested, the baby was taken to the home of his paternal grandmother, a placement previously found to be unsafe because of the woman's deteriorating health condition. It was from there that a CPS worker was called three days after the arrest and where she found the then five-month-old infant laying in a playpen, because no appropriate bedding was in the house, wearing a urine soaked diaper. All of these factors show that the father, who seemingly succeeded in adhering to the requirements of an improvement period, proceeded in short or-

der after assuming custody of Cecil T. to make improper choices regarding the infant by blatantly disregarding the child's best interests and placing Cecil T. directly in harm's way by selling firearms in the baby's presence. Furthermore, the father offered no explanation of how he could or proposed to remedy the situation of neglect and abuse. Also relevant and significant to the issue of termination of parental rights was the lower court's observation during the hearing that no strong emotional bond existed between the infant and Appellee since a majority of this child's life had been spent with Appellants as his caretakers.

■■■ We appreciate the lower court's obvious concern with terminating parental rights when the parent is incarcerated and is thereby limited in demonstrating the present ability to redress the apparent conditions of abuse and neglect. However, this Court has made it quite clear that under any circumstances "courts are not required to exhaust every speculative possibility of parental improvement ... where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements." Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). We have further said that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

During its deliberations, the lower court expressly recognized this Court's holding in syllabus point five of *In re Emily*,[14] 208 W.Va. 325, 540 S.E.2d 542, and correctly chose not to enter an order granting a dispositional improvement period with a delayed

onset date. However, by ordering that the child's legal custody remain with DHHR and his physical custody be continued with Appellants without terminating parental rights, the lower court allowed the father's incarceration to define the time period in which the father may attempt to rectify the conditions of abuse and neglect and thereby created another type of delay in developing a child's permanency plan. Doing so leads to the same timeliness problems discussed in *In re Emily*.

■■■ The case of *In re Emily* involved a situation quite similar to the one before us, except neither parent was immediately free to participate in a dispositional improvement period in a normal way because the mother was engaged in a long-term inpatient substance abuse treatment program and the father was incarcerated. The lower court had granted delayed dispositional improvement periods to commence upon the discharge or release of each parent. We essentially found that no statutory authority existed to delay implementation of a dispositional improvement period since doing so would contradict the established legislative purpose of expediting abuse and neglect cases so as to safeguard the welfare of the children. We went on to say that "the delayed implementation of the respondent parents' improvement periods is particularly problematic because, by the very terms of the court's ruling, the delay is indefinite," and is based on a presupposition that there would come a time when the parents could be able to accomplish what they had previously been unable to do. *Id.* at 337, 540 S.E.2d at 554. The very same problems exist in giving a parent who is not able in the near future to alter the conditions causing the abuse and neglect of a child the opportunity to later demonstrate his or her ability to rectify the situation at some indefinite point in the future. Although aimed at the dispositional improvement periods under discussion, the admonition in syllabus point six of *In re Emily*[15] regarding adherence to statutory

**14.** As stated in syllabus point five of *In re Emily*, "[t]he commencement of a dispositional improvement period in abuse and neglect cases must begin no later than the date of the dispositional hearing granting such improvement period."

**15.** Syllabus point six of *In re Emily* states: "At all times pertinent thereto, a dispositional improvement period is governed by the time limits and eligibility requirements provided by W.Va. Code § 49–6–2 (1996) (Repl.Vol.1999) [pre-adjudicatory and post-adjudicatory improvement period], W.Va.Code § 49–6–5 (1998) (Repl.Vol.

time limits and eligibility requirements has equal application to all abuse and neglect matters. 208 W.Va. at 328, 540 S.E.2d at 545. Decisions regarding parental rights and a child's needs for permanency and stability are no exception. We find no provision anywhere in the abuse and neglect statutes giving courts discretion to create what the lower court termed a "limbo period" where a permanency plan for an abused or neglected child may be placed on hold indefinitely. Importantly, Rule 43 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings unequivocally directs that "[p]ermanent placement of each child *shall* be achieved within eighteen (18) months of the final disposition order, unless the court specifically finds on the record extraordinary reasons sufficient to justify the delay." Emphasis added. This eighteen-month period is not a mere suggestion, but a standard to which courts should faithfully and routinely adhere except in the most extraordinary or unusual circumstances—circumstances which simply are not present here. Strict adherence to the eighteen-month period furthers the best interests of children victimized by abuse and neglect because their need for permanency in a secure environment is paramount. Consequently, we hold that the eighteen-month period provided in Rule 43 of the West Virginia Rules of Procedures for Child Abuse and Neglect Proceedings for permanent placement of an abused and neglected child following the final dispositional order must be strictly followed except in the most extraordinary circumstances which are fully substantiated in the record.

Having found error as to a matter of law, we reverse the ruling of the lower court. We additionally find that the record relates sufficient facts and circumstances warranting termination of parental rights.

### IV. Conclusion

Based upon the aforementioned reasons, the January 29, 2010, order of the Logan County Circuit Court is reversed, and the case is remanded for entry of an order terminating the father's parental rights and ad-

1999) [post-adjudicatory improvement period], and W.Va.Code § 49-6-12 (1996) (Repl.Vol.

vancement of the permanent placement of the child.

Reversed and remanded.

1999) [improvement period generally]."