## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**In Re: L.H., C.H., & J.T.**

**No. 14-0254** (Ohio County 13-CJA-87, 13-CJA-88 & 13-CJA-89)

**FILED**

June 16, 2014

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

### MEMORANDUM DECISION

Petitioner Mark D. Panepinto, guardian ad litem for the children C.H. & J.T.-1, appeals the Circuit Court of Ohio County's February 11, 2014, adjudicatory order.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee A. Niezgoda, filed its response in support of the guardian's petition for appeal and alleging error by the circuit court. The guardian ad litem for the child L.H., Kristen Andrews Wilson, filed a response on behalf of the child supporting the petition for appeal and alleging error by the circuit court. Respondent Father, K.T., has filed a response, by counsel Justin M. Hershberger, supporting the circuit court's ruling below.[2] Respondent Mother, J.T., has filed a response, by counsel Gerald G. Jacovetty Jr., supporting the circuit court's ruling below. Richard W. Hollandsworth, counsel for the biological mother of C.H. and J.T., H.A., filed a response on his client's behalf supporting the circuit court's ruling below. On appeal, petitioner alleges that the circuit court erred in failing to find the parents, K.T. and J.T., were abusing parents, as well as making other erroneous findings of fact.[3]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds that the circuit court erred in failing to adjudicate K.T. and J.T. as

---

[1]Because the child J.T.-1 shares the same initials as his mother, J.T., the Court will refer to the child by his initials and the number one in order to distinguish the two in this memorandum decision.

[2]Respondent Father K.T. has another child, R.M., who was included in the abuse and neglect proceedings below. However, K.T. asserted in the circuit court that he had voluntarily relinquished custody of that child to the mother, C.M., who was not a named respondent in the proceedings below. According to the record, the child lives with the mother in Nebraska. The transcript of the adjudicatory hearing indicates that the child was dismissed from the petition. As such, this memorandum decision does not address the child, R.M.

[3]J.T. and K.T. are the biological parents of J.T.-1 only and serve as custodians to L.H. and C.H. However, because all three children reside in J.T. and K.T.'s home and in the interest of avoiding confusion, the Court will refer to them as "parents," "mother," and "father" throughout this memorandum decision, despite their status as custodians to L.H. and C.H.

abusing parents.[4] This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Revised Rules of Appellate Procedure and is therefore appropriate for a memorandum decision reversing the circuit court rather than an opinion.

In July of 2008, H.A., the biological mother of L.H. and C.H., was living in Florida with the two children when she contacted her sister, J.T., and asked her to take the children. H.A. reported that she was living with her mother and step-father and that her step-father was abusing the children. H.A. wanted to remove the children from the home. An investigation in Florida revealed that C.H., then two years old, had been masturbating and complaining that her bottom hurt, and that L.H., then three years old, alleged that his step-grandfather had kissed his private area and that his bottom hurt. L.H. was also observed performing oral sex on a doll. At the time, J.T. had no children of her own and brought the children to live in Cabell County, West Virginia, where she resided with her then-husband, J.L. The children's father, T.H., who was also living in Cabell County, filed a domestic violence petition against J.T. and took custody of the children for approximately one week. A hearing was later held on the petition and the Cabell County Family Court returned the children to J.T. and gave her legal custody of the children.

Over the next few years, J.T. expressed concerns about L.H.'s behavior to medical professionals, resulting in L.H. being placed in therapy and prescribed medications for attention deficit hyperactivity disorder, among other conditions. Additionally, J.T.'s marriage with J.L. was turbulent, resulting in the couple essentially separating but living in the same home for the children's sake. J.L. would become violent when intoxicated and perpetrated domestic violence on J.T. in the children's presence. Due to financial distress, J.T. continued to reside with J.L. until October of 2011, when they ultimately separated, with their divorce becoming final in November of 2012.

In January of 2012, J.T. began a relationship with K.T., her current husband. In March of 2012, Child Protective Services ("CPS") received the first of many referrals regarding the children. It was alleged that L.H., then approximately seven years old, was left home alone for seven hours the prior day. The report also indicated that L.H. stayed home by himself often, that the children slept on the floor, that the home had no furniture, and that the children were often hungry. These reports were investigated but were not substantiated. In October of 2012, CPS in Ohio County received a report that L.H. had alleged that K.T. pulled his ears and hair, that he and C.H. had to scrub the basement floor with a wire brush as punishment, and that K.T. locked him in his room and forced him to urinate in his closet. These reports were again unsubstantiated and when CPS contacted L.H.'s pediatrician, the doctor indicated that L.H. has a history of lying and "tends to lie when he is no longer happy where he is staying."

---

[4]The parties to this appeal specifically state that the circuit court erred in failing to rule that J.T. and K.T. are "neglectful parents." However, the Court notes that pursuant to West Virginia Code § 49-1-3(2), an abusing parent is defined as "a parent, guardian or other custodian, regardless of his or her age, whose conduct, as alleged in the petition charging child abuse or neglect, has been adjudged by the court to constitute child abuse *or neglect*." (Emphasis added). As more fully addressed in the body of the memorandum decision, the conduct of J.T. and K.T. constitutes neglect as to the children, which therefore requires that the parents be adjudicated as abusing parents.

2

In December of 2012, J.T. and K.T. gave birth to their first child, J.T.-1. In January of 2013, J.T. took L.H. to his pediatrician and it was noted that his "Active Problems" remained unchanged. The notes from this visit indicate that L.H. was to be tested for oppositional defiant disorder and adjustment issues. In July of 2013, L.H. was admitted to the Ohio Valley Medical Center, Hillcrest Behavioral Health Services ("Hillcrest") after he threatened to hurt himself, C.H., and J.T.-1. L.H. talked about using knives to achieve this end, and also admitted to wrapping a blanket around infant J.T.-1 and trying to suffocate him. J.T. also reported that L.H. had choked C.H., hit her, sat on her face, and touched her inappropriately. It was also noted that L.H. engaged in inappropriate contact with other children. While at Hillcrest, L.H. reported that it was not safe to go home because he was afraid his "dad" would hit him, but refused to elaborate further. As a result, CPS was contacted and an investigation undertaken. The reports were ultimately unsubstantiated, as L.H. later clarified that he was referring to J.T.'s ex-husband, J.L., not K.T. L.H. was ultimately released from Hillcrest on August 8, 2013.

In September of 2013, J.T. and K.T. were married. Early that same month, C.H. asked J.T. for an inside lock for her bedroom door. Knowing this was a red flag, J.T. continued to talk to the child, who disclosed that L.H. had been coming into her room at night and doing inappropriate things to her, but she did not provide further detail. J.T. immediately had L.H. admitted to Hillcrest a second time, where he was referred to Fox Run Hospital for more intensive treatment. After being admitted, L.H. told staff that he had been admitted to the hospital because "he was raping his sister." On September 21, 2013, a licensed psychologist completed an evaluation of L.H. Notes from this evaluation indicate that L.H. "has been sexually involved with his younger sister as a perpetrator." During his time in the hospital, L.H. admitted that he threatened to kill himself and had also almost killed J.T. and K.T. with a knife while they slept one night. L.H.'s testing score was significant for clinical depression, which he reported he had suffered since he was five years old. L.H. remained hospitalized for a total of seventy-eight days.

In October of 2013, J.T. and C.H. were on the front porch waiting for a friend to arrive to take C.H. to school. J.T.-1 began to cry from inside the home, so J.T. went inside to attend to him. Shortly thereafter, C.H. came inside and informed J.T. that her ride had arrived. Moments later, J.T. looked outside and saw the friend's vehicle waiting. J.T. asked the friend where C.H. was and she informed J.T. that the child had gotten into a taxi that left just as she arrived. The police were contacted and it was later determined that a child who lived one street over took a taxi to school each day. A new driver was working that day, arrived at the wrong address, and informed C.H. that he was there to take her to school. The child arrived at school safely and nothing inappropriate occurred as a result of the taxi ride. However, CPS was contacted.

On October 18, 2013, a CPS worker interviewed C.H., who reported that she found her mother's "butt medicine" (Dulcolax) under L.H.'s bed and told J.T. about it. According to C.H., J.T. was angry and forced L.H. to eat the medicine with C.H.'s help. The medicine made L.H. vomit and defecate. C.H. also reported that J.T. and K.T. beat her and L.H. with a belt, leaving marks and bruises. C.H. told the CPS worker that she was afraid of J.T. and K.T., that she was afraid L.H. and K.T. would come into her room and hurt her. C.H. alleged that L.H. told her to hurt J.T.-1 and that she witnessed J.T. and K.T. fighting and hitting each other.

Three days later, the CPS worker interviewed L.H., who reported that after getting into trouble, J.T. forced him to eat five Dulcolax suppositories. He stated it made him sick and caused him to vomit and defecate. L.H. also alleged that J.T. rubbed his face in feces. Further, L.H. alleged that K.T. beat both children with a belt, and once made him eat a sandwich with old cheese on it, causing him to vomit. The CPS worker then attempted to re-interview C.H., but the child told her that J.T. said she could not talk to the CPS worker or she would be taken out of the home. C.H. did recant the allegation that she was hit with a belt, but stated that K.T. did hit L.H. with a belt and left a bruise. C.H. also stated that she felt safe in the home and was not afraid of J.T. or K.T. The CPS worker then spoke with J.T. and K.T. about telling C.H. not to talk to her. They denied instructing her as such, and noted that their in-home service provider had recently visited with C.H. and instructed her not to lie about the Dulcolax incident or she would be taken out of the home. The CPS worker also interviewed the friend who gives C.H. rides to school. The woman reported that L.H. had talked to her about physical abuse in the home. She further stated that C.H. had also disclosed physical abuse. The friend also stated that sometimes when she picked C.H. up for school, J.T. would not be waiting with her. At the CPS worker's request, J.T. and K.T. allowed the children to be interviewed at Harmony House.

During an interview at Harmony House on October 24, 2013, C.H. reported the following: 1) no one touches her in a bad way; 2) L.H. has touched her privates when she was at home in bed; 3) L.H. hit her privates with his arm and leg; 4) L.H. choked her, pulled her hair, and kicked her bottom; 5) she never told anyone about L.H.'s conduct; 6) she has not seen anything done to L.H.; 7) she has not seen any fighting between J.T. and K.T.; 8) L.H. took the Dulcolax himself, telling her that he wanted to die and for it to be mommy's fault; and 9) mommy and daddy told her to tell the truth. The next day during his interview at Harmony House, L.H. reported the following: 1) "dad" pulled C.H.'s hair; 2) "dad" and "mom" spank him with a belt over his clothes and it doesn't leave a mark; 3) mom and dad were fighting because dad took her credit card and cell phone; 4) mom took a knife and tried to kill dad; 5) mom shoved Dulcolax into his mouth and made him eat five or six pills that made him sick; and 6) he feels safe at home.

On October 29, 2013, the DHHR filed a petition for abuse and neglect against J.T. and K.T. based upon the taxi incident and subsequent CPS investigation. That same day, emergency custody of the children was transferred to the DHHR. The next month, J.T. and K.T. waived the preliminary hearing. Ultimately, the circuit court held an adjudicatory hearing in February of 2014. After hearing extensive testimony concerning the DHHR's allegations, the circuit court found that the DHHR failed to meet its burden to establish that J.T. and K.T. are abusing parents. As such, the circuit court dismissed them from the petition.

The circuit court also made the following findings of fact, pertinent to this appeal: 1) L.H. has never exhibited any physical injuries from abuse, nor has C.H., except for one occasion when she exhibited a bruise; 2) there is no physical evidence or medical evidence that L.H. or C.H. has been abused by J.T. or K.T.; 3) it is clear that L.H. is a troubled child in need of long term and intensive treatment and care; 4) based on C.H.'s disclosure that L.H. would kill her if she lied, it is unclear whether her allegations against J.T. and K.T. are true and accurate; 5) that L.H.'s medical history includes a history of lying, developmental delays, potential autism, and visual

4

hallucinations that raised doubt as to the truth and accuracy of his allegations; and 6) there is no evidence that J.T.-1 was the victim of any physical or other abuse. The circuit court therefore found that J.T. and K.T. made their best efforts to protect the children and were not negligent, irresponsible, or reckless in failing to protect C.H. from being abused by L.H. The circuit court also found that the taxi incident was "an isolated and bizarre incident that does not demonstrate a pervasive pattern of failure to supervise or protect the children." Shortly after the adjudicatory hearing, the circuit court entered an amended adjudicatory order, finding that "it is in the best interest of [L.H.] to remain in the legal and physical custody of [the] DHHR and [he] shall remain at the St. John's Home for Children until further Order of the Court." It is from the adjudicatory order that petitioner, guardian ad litem for C.H. and J.T.-1, appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). Upon our review, the Court finds that the circuit court erred in finding that "the State has failed to meet its burden of proof that J.T. and K.T. are abusi[ng] . . . parents" and in dismissing them from the proceedings below.

To begin, West Virginia Code § 49-1-3(11)(A)(i) defines a neglected child as one

> [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian . . . .

The record clearly shows that the parents' failure to properly supervise the children resulted in both threats and harm to all of the children in the home. While the Court agrees with the circuit court's assessment that both parents have tried to be appropriate caregivers and are dealing with an unusual and highly difficult set of circumstances, the undisputed facts of this case clearly show that the parents failed to protect the children through necessary supervision. Further, while the Court agrees with the circuit court's findings regarding the potentially untruthful nature of the disclosures from L.H. and C.H., it is clear that the testimony from the parents, as well as

evidence from prior disclosures by the parents to medical professionals and CPS employees, is more than sufficient to support a finding that J.T. and K.T. are abusing parents.

As early as 2008, J.T. identified that L.H. was acting out sexually, having expressed concerns to medical professionals that he often touched himself inappropriately. At adjudication, J.T. also testified that L.H. would remove C.H.'s diaper and insert his fingers into C.H.'s vagina. In April of 2010, J.T. again expressed that L.H. was having disciplinary problems in the home. Further, pursuant to a CPS report following an investigation into the conditions of the home conducted in October of 2012, both J.T. and K.T. were aware that L.H. had "tried to kill his little sister[,]" C.H. At that time, the parents also reported that L.H. had killed an animal in the past and was lighting matches before saying that he was going to burn down K.T.'s parents' home. Additionally, when L.H. was admitted to Hillcrest in July of 2013, J.T. reported that L.H. was aggressive with C.H., having choked his sister and also touched her inappropriately. At that time, J.T. reported that L.H. was also engaging in inappropriate contact with other children. During his time at Hillcrest, L.H. admitted he threatened to hurt himself and the other children in the home, and talked about the use of knives to achieve this end.

Despite the overwhelming evidence that L.H. presented a threat to himself and to the other children in the home, the parents continued to provide the children with inappropriate supervision. This resulted in continued harm, and the threat of harm, to the children, as evidenced by the fact that C.H. asked for a lock inside her bedroom door in September of 2013 due to ongoing sexual abuse by L.H. According to J.T.'s later testimony, C.H. disclosed that L.H. had been coming into her room at night and doing inappropriate things to her, including holding a knife to C.H.'s throat while he inserted objects inside her. Despite clear warnings that L.H. had been abusing his sister since 2008, including additional instances of J.T. reporting aggressive conduct toward C.H. in 2012 and 2013, J.T. failed to take appropriate action to protect C.H. and the child ultimately disclosed additional abuse as late as September of 2013. Based upon this evidence, it is clear that the parents had multiple warnings of the dangers L.H. posed to the other children in the home, yet failed to provide necessary supervision and, as a result, allowed C.H. to be abused by her brother.

Further, J.T. testified that L.H. began exhibiting issues with regard to J.T.-1 prior to the child's birth, having threatened to kill the child while J.T. was still pregnant. According to J.T.'s testimony, medical professionals recommended that she get L.H. treatment for these issues at that time, yet he was not admitted to Hillcrest for the first time until July 30, 2013, approximately eight months after J.T.-1's birth.[5] According to J.T., L.H. would go into the infant's room and stare at his crib after J.T.-1 was born. Further, during his time at Hillcrest in July of 2013, L.H. admitted to having wrapped a blanket around the infant, J.T.-1, in an attempt to suffocate him. Also, J.T. specifically testified that L.H. "tried to kill" J.T.-1. While it may be true that "there is no evidence that [J.T.-1] has been the victim of any physical or other abuse[,]"

---

[5]While the record does state that L.H. was receiving therapy as early as April of 2010, it appears that this was in regard to his various developmental delays, non-violent behavioral issues, and learning disabilities. It is not until L.H. was admitted to Hillcrest in July of 2013, following his threats of self-harm, that the record contains evidence of treatment designed to alleviate the child's violent tendencies.

as the circuit court found at adjudication, the fact remains that L.H. clearly presents a threat to the child's health because of the parents' lack of necessary supervision in the face of clear warnings.

Additionally, the Court finds clear error in the circuit court's characterization of the "taxi incident" as a "bizarre incident that does not demonstrate a pervasive pattern of failure to supervise or failure to protect the children." While it is true that the specific facts of that incident are indeed bizarre, the Court notes that J.T.'s failure to properly supervise C.H. on that occasion is in keeping with the overarching pattern of failure to supervise that was present throughout these children's lives. This is supported by the testimony from the friend who provided C.H. with a ride to school, who said that sometimes when she would pick up C.H., J.T. would not be on the porch waiting with the child. As such, it is clear that J.T.'s failure to properly supervise C.H. while waiting for her ride was not isolated in that context, let alone in the history of the children living in her home.

Pursuant to West Virginia Code § 49-1-3(2), an abusing parent is defined as "a parent, guardian or other custodian, regardless of his or her age, whose conduct, as alleged in the petition charging child abuse or neglect, has been adjudged by the court to constitute child abuse *or neglect*." (Emphasis added). According to West Virginia Code § 49-1-3(11)(A)(i), a neglected child is one

> [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian[.]

Based upon the evidence above, it is clear that the conduct of J.T. and K.T. constitutes, at a minimum, neglect as to the children based upon their failure to adequately supervise them. Therefore, it was clearly error for the circuit court to fail to adjudicate them as abusing parents.

For the foregoing reasons, we reverse and remand this matter to the circuit court for the entry of an adjudicatory order finding J.T. and K.T. to be abusing parents/custodians, and for further proceedings consistent with the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings and West Virginia Code § 49-6-1 to § 49-6-12. Further, the Court directs that the child, L.H., shall remain in DHHR custody pending additional proceedings and until such time as it is in the child's best interest to return to the home. Finally, the Court orders a review of the services provided to the family, including L.H., to ensure that the child receives appropriate placement and treatment during the pendency of the proceedings below.

Reversed and Remanded.

**ISSUED**: June 16, 2014

**CONCURRED IN BY**:

Chief Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II