No. 22-698 – *In re B. P.*

WOOTON, J., dissenting:

**FILED**

**November 8, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

I dissent to the majority's affirmance of the circuit court's adjudication and termination of petitioner's parental rights based solely on his incarceration, in contravention of our decades-long precedent that mere incarceration is not grounds for termination of parental rights. The most salient facts of the instant case alone—which the majority tellingly omits—demonstrate the error of the circuit court's adjudication and disposition. However, the majority not only ignores these facts and affirms, but extrapolates this scenario into a far-reaching syllabus point that will continue to yield inequitable results wholly at odds with the purpose of our abuse and neglect system. Therefore, I respectfully dissent.

I.    *ADJUDICATION AND DISPOSITION OF PETITIONER'S PARENTAL RIGHTS*

In a mere four and a half months, petitioner went from learning he had a daughter to having his parental rights to her terminated because he "abandoned" her by being incarcerated when he learned of her existence. Only three months after the termination of his parental rights, petitioner was paroled and has since discharged his parole supervision, has independent housing, and is employed.

At the time of his incarceration on September 2, 2021, petitioner was wholly unaware that biological mother T. P. was pregnant with his child. In fact, at the time the

1

petition against T. P. was filed, the father was listed as "unknown," and T. P. later advised that she believed another man was the father. Only after that individual was ruled out as the father was petitioner identified for genetic testing. It was not until January 27, 2022, that petitioner became aware that he was the father of B. P.—over two months after her birth, the filing of the petition against T. P., and nearly five months after his incarceration began.

Petitioner was not made a respondent to the instant case until March 1, 2022. His first adjudicatory hearing was set for March 7, 2022—six days after he was served with the petition. Upon his motion the adjudicatory hearing was moved to April 11, 2022. At adjudication testimony revealed that in the interim petitioner had "gotten back to some of his family," resulting in his sister and another relative reaching out to DHHR to inquire about visitation. Further, a mutual friend of petitioner and T. P. came forward and expressed interest in a home study for placement. At the first adjudicatory hearing on April 11, petitioner requested a continuance "for the purpose of having a family friend be considered as a potential placement option for the child." These developments—precipitated solely by petitioner upon discovery that he was B. P.'s father—demonstrate his interest in creating a familial connection with B. P. and seeing to her care.

At adjudication, petitioner testified that B. P. was his first child and that he "wanted a kid all my life. I have never had the opportunity. I didn't think I could have kids. I found out when I was incarcerated." He expressed his fervent desire to have the

2

opportunity to parent, stating "I just need a chance, like I just need a chance. That's all I need, one chance. Give me enough rope to hang myself, and if I do it, then fine, bury me, but just let me have one chance." He expressed that upon parole he wanted to put his life "on the right track" and would "work two jobs, whatever it takes[]" to provide for B. P. In this context, "'[a]bandonment' means any conduct that demonstrates the settled purpose to forego the duties and parental responsibilities to the child[.]" W. Va. Code § 49-1-201 (2018); *see also In re C.M.-1*, 247 W. Va. 744, 755, 885 S.E.2d 875, 886 (2023) (Wooton, J., dissenting) (rejecting majority's finding of abandonment where father paid court-ordered child support and "wanted – and sought – to have a relationship with the child."). Petitioner's testimony clearly demonstrates that he had no intention of abandoning his only child.

In addition to his request for a chance to demonstrate his desire and ability to parent, it was abundantly clear to the circuit court that petitioner may very well have that chance in the immediate future. At the dispositional hearing on June 28, 2022, petitioner requested a brief continuance until after his parole eligibility date of September 3—scarcely two months away—which the circuit court summarily denied. The circuit court further denied a dispositional improvement period, finding that petitioner had not "taken any real action to attempt to remedy the [c]ourt's findings of abuse and/or neglect[]" and had not "acknowledged any real wrongdoing giving rise to the [c]ourt's findings of abuse and/or neglect in this matter[.]" To the contrary, petitioner expressed, repeatedly, that he "didn't make the right decisions[,]" admitting that "I messed up and I acknowledge my

3

mess up" relative to his incarceration.[1] The only acknowledgement he refused to make during the proceedings was that of being a drug user—an allegation for which there currently stands no record evidence. More to the point, because the majority concludes that the "wrongdoing" for which petitioner was adjudicated was abandonment due to incarceration, that specific "wrongdoing" cures itself upon his release.

In support of the circuit court's termination, the majority highlights its finding that petitioner had "no plans in place to take care of or provide for B.P. in the event he was released from prison[.]" The majority further notes the circuit court's conclusion that petitioner "refused [] recommended services because it would require him to participate in a six-month program that could possibly delay his release." Both of these accusations, however, are manifestly unfair to petitioner. Given that he had no knowledge of B. P.'s impending birth when he began his incarceration, and the obvious limitations on making such arrangements while incarcerated, it is unclear what the circuit court believed he should have in place by the time of disposition. More importantly, there is no evidence that any assistance or services were offered by the Department of Health and Human

---

[1] In fact, petitioner testified that after he discovered he was B. P.'s father, he discussed the child with T. P., who told him that she had lost her rights to B. P. Petitioner advised her that, as a result, "I am not sure if I can still, contact, keep in contact . . . because I don't want my chance for my rights to be taken away." As is all too familiar to this Court, respondent parents frequently fail or refuse to cut off contact with a co-parent whose rights have been involuntarily terminated. To demonstrate this level of insight—without the prompting or involvement of DHHR or the circuit court—unquestionably differentiates petitioner from a great many other parents whose rights have been terminated.

Resources ("DHHR") to help establish those arrangements if he were paroled, as are offered to so many parents lacking the same support.

In fact, the Child Protective Services ("CPS") supervisor who testified at adjudication addressed petitioner's possible parole, stating that "[g]iven that he would be on parole and eligible to do services, yes, we could, but it's just we can't do anything while incarcerated"; he further confirmed there was "no reason" petitioner could not participate in an improvement period if paroled. Regardless, the circuit court repeatedly advised petitioner that he should investigate the availability of services himself because "I don't expect the [DHHR] to do it for you[.]" This attitude stands in direct contradiction to the stated goal of these proceedings and the obligation of DHHR to provide services aimed at correcting the conditions of abuse or neglect: "[T]he over-arching purpose of our abuse and neglect statutory construct continues to be the correction of conditions of abuse and neglect and the return, if reasonably possible, of the children to their homes." *State ex rel. C. H. v. Faircloth*, 240 W. Va. 729, 741, 815 S.E.2d 540, 552 (2018); W. Va. Code § 49-4-604(c)(6)(C)(iv) (2020) (requiring, before termination, a finding as to "[w]hether or not the department made reasonable efforts to *preserve and reunify* the family, or some portion thereof" (emphasis added)).

As for petitioner's refusal to enter a six-month institutional program available through the jail (presumably designed to provide adult life skills and/or parenting services), the CPS supervisor testified that, despite having no "firsthand knowledge" of

what the program entailed, he was "really concerned" about petitioner's refusal to enter the program and that it "raise[d] a lot of question marks." In response, petitioner explained that had he enrolled, "it would have put me another six months back . . . when I have an option to get out [on parole] in September which is two months, and *then I could have been in the child's life sooner*. Why would I prolong?" (Emphasis added). To suggest that petitioner should have entered a program that delayed his potential release with certainty is absurd; any services necessary should have been made available to him by DHHR upon his release. For that matter, to voluntarily request enrollment in a program that would serve to delay his release from incarceration only *exacerbates* the alleged basis of his adjudication—abandonment—as petitioner himself noted: "[T]hat would make more time that would make me look even worse."

West Virginia Code § 49-4-604(e) permits the circuit court "as an alternative disposition, [to] allow the parents or custodians an improvement period not to exceed *six months*. During this period the court shall require the parent to rectify the conditions upon which the determination was based." (Emphasis added); *see also* W. Va. Code § 49-4-610(3) (2015) (outlining showing necessary to grant six-month post-dispositional improvement period). These improvement periods—or similar six-month post-adjudicatory improvement periods under § 49-4-610(2)—are regularly awarded by circuit courts prior to or in lieu of termination of adjudicated neglectful parents. West Virginia Code § 49-4-610(6) even permits an additional three months' extension to the improvement period under certain conditions. Here, petitioner was adjudicated and terminated in

6

significantly less time than it takes to complete a single, commonly awarded improvement period. When compared to the treatment regularly afforded non-incarcerated parents who inflict severe neglect or abuse upon their children or actively subject them to inadequate supervision, exposure to inappropriate people and environments, and domestic violence, the treatment afforded petitioner is patently disparate.

The circuit court could plainly have justified the award of a six-month improvement period which would have encompassed petitioner's parole eligibility date and allowed him time to establish the infrastructure and support needed to demonstrate his ability to maintain some role in B. P.'s life. During that time, petitioner was in fact paroled and clearly followed through on rectifying all the deficiencies identified by DHHR: incarceration, lack of permanent housing, and lack of employment. And while recognizing the circuit court did not have the benefit of hindsight and did not know for certain that petitioner would be paroled, it is important to note that West Virginia Code § 49-4-610(7) permits any party to move for termination of the improvement period for failure to "fully participate." Had petitioner been declined parole, the improvement period could have been terminated upon motion of any party.

In short, the circuit court's refusal of an improvement period and termination of petitioner's rights due to abandonment lacks both factual and legal basis. The lack of support for these rulings is because, contrary to the majority's declaration that petitioner was adjudicated for abandonment, the circuit court actually adjudicated petitioner due to

7

its belief that he was a drug user and dealer.  Counsel for DHHR argued:  "He suffers from a bad substance abuse issue.  He needs the Phoenix House or he needs drug court.  He is a user."  During the adjudicatory hearing, the circuit court focused primarily on petitioner being "in the drug culture" and—without evidence—that he was "no doubt using drugs with [T. P.]"  The order mirrors this conclusion, stating that petitioner "is involved in the drug culture; that he uses and deals drugs; and that his incarceration is due to his involvement with drugs."  Petitioner adamantly denied that he was a drug user; whether that was the case or not, there simply is no evidence of drug use in the record—only the *suggestion* of drug use due to petitioner's conviction as a drug dealer.  Of course, at the time of the filing of the petition and adjudication, petitioner was neither a drug dealer nor user because he was incarcerated.  The majority pivots from these allegations because they cannot substantiate the circuit court's rulings.

However, other findings of the circuit court are equally unsubstantiated.  To affirm the circuit court, the majority finds that it actually adjudicated petitioner for abandonment.  The majority cites to the court's conclusion that petitioner "failed to emotionally or financially support his child"; however, the circuit court stated during the adjudicatory hearing that "I realize he may not have been financially able to support [B. P.]"  There was no evidence 1) that petitioner was ordered and failed to pay support upon

establishing paternity, as required by W. Va. Code § 49-4-801 (2015)[2]; or 2) that petitioner would otherwise have the means or ability to determine to whom support should be paid given B. P.'s custody with DHHR.

The circuit court further claimed that "there is certainly law indicating that he has the duty to know if he has a child[.]"  In its order, the circuit court declared this the "ultimate" form of neglect, further concluding, as a matter of law, that petitioner had a duty to know of T. P.'s "history with CPS" and "addiction to drugs."  Of course, these broad conclusions are neither factually nor legally supportable and the majority similarly distances itself from them, focusing instead on abandonment.

II.    THE MAJORITY'S NEW SYLLABUS POINT

This Court has long held that "[a] biological parent of an infant child does not forfeit his or her parental right to the custody of the child merely by reason of having been convicted of one or more charges of criminal offenses." Syl. Pt. 2, *State ex rel. Acton v. Flowers*, 154 W. Va. 209, 174 S.E.2d 742 (1970).  In that vein, we elaborated further

---

[2] *See* W. Va. Code § 49-4-801(c) ("When a child is removed from his or her home pursuant to this chapter, the court shall issue a support order payable by the child's mother. If the child's legal father has been determined, the court shall issue a child support order payable by the legal father."); W. Va. R. Child Abuse and Neglect P. 16a ("Every order in a child abuse and neglect proceeding that alters the custodial and decision-making responsibility for a child and/or commits the child to the custody of the Department of Health and Human Resources must impose a support obligation upon one or both parents for the support, maintenance and education of the child, pursuant to W. Va. Code § 49-4-801, *et seq.*").

that "incarceration, *per se*, does not warrant the termination of an incarcerated parent's parental rights." *In re Brian James D.*, 209 W. Va. 537, 540, 550 S.E.2d 73, 76 (2001); *see also In re Cecil T.*, 228 W. Va. 89, 97, 717 S.E.2d 873, 881 (2011) ("[T]he mere fact that someone is incarcerated will not result in automatic termination of parental rights[.]").

Notwithstanding these holdings and the facts of this case, the majority issues a new syllabus point which broadly holds that "absence" due to incarceration that results in "the inability of the parent to provide" for the basic care and needs of his or her child is neglect. The breadth of this holding and its lack of temporal boundaries provides a basis for instituting abuse and neglect proceedings against virtually any incarcerated person, effectively overruling our decades-long precedent to the contrary. Plainly, an incarcerated person, i.e., "the parent" referenced in the syllabus point, is in no position to directly "provide" any of those basic needs. When a parent is incarcerated, obviously another parent, guardian, or caretaker is providing those needs.

However, as is well known to the majority, abuse and neglect proceedings are frequently initiated against both parents contemporaneously. This results in a parent having automatically "abandoned" his or her child if he is or becomes incarcerated during the proceedings because the incarcerated parent is then failing to provide for the child's basic needs by default. That is precisely what happened in the instant case: under the majority's new syllabus point, because B. P. had been removed from T. P. and her rights

10

were subsequently terminated, petitioner's incarceration—regardless of the surrounding circumstances—automatically rendered him a neglectful parent.

More importantly, the syllabus point's reference to mere "absence"—without requisite duration of absence—makes the syllabus point subject to misapplication. Under this holding, any temporary absence due to incarceration, irrespective of how long the incarceration has or will last and any attempts to indirectly provide care, must result in an adjudication as a neglectful parent.

To be clear, my dissent should not be construed as turning a blind eye to the serious nature of the convictions for which petitioner was incarcerated and the healthy concern over his ability to become a parent to such a young child. However, incarceration itself is designed to remedy that behavior; failing to provide petitioner an opportunity to demonstrate that the behavior had been remedied runs entirely contrary to the remedial goals of our abuse and neglect system. Our abuse and neglect system is designed to provide the support and services necessary to enable parents to rectify any shortcomings in their parenting abilities. While I recognize that there are obviously situations in which long-term incarceration must result in termination of parental rights to ensure permanency for a child, this case simply is not one of those situations. In contrast to the cases relied upon by the majority, petitioner was not, with certainty, facing a lengthy sentence. See *In re A. P.-1*, 241 W.Va. 688, 827 S.E.2d 830 (2019) (incarcerated father facing life sentence and ineligible for parole for ten years). He also did not engage in additional conduct

constituting abuse and/or neglect. *See Cecil T.*, 228 W. Va. at 93, 717 S.E.2d at 877 (terminating parental rights of incarcerated father where father possessed and sold firearms in presence of child and left him with inappropriate caregiver); *see also In re M.M.*, No. 12-0491, 2012 WL 4069593, at *3 (W. Va. Sept. 7, 2012) (memorandum decision) (affirming abandonment due to incarceration where "even when [father] was not incarcerated, he failed to be a caregiver for the child, and had little to no contact with the child."). In fact, petitioner's parenting abilities were nothing more than an abstract proposition—both critiqued and terminated on the basis of a temporary condition which DHHR contended absolved them of any duty to provide services or support to petitioner.

One need only scan a handful of this Court's abuse and neglect cases to see the shocking abuse and neglect to which children are regularly subjected and the extensive services, resources, and remedial efforts regularly expended on the respondent parents to preserve the family unit—often with a complete lack of interest and effort on the part of those parents. Those cases stand in stark contrast to the treatment afforded petitioner in this case. More to the point, petitioner himself stands in substantial contrast to so many parents with whom this Court unfortunately contends. To exacerbate that treatment with a new rule of law—a rule that invites courts to do the same to other respondent parents—is ill-advised. Accordingly, I respectfully dissent.

12