**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**

**June 24, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **E.W.-D., E.W., A.M., and P.W.**

**No. 19-0855** (Monongalia County 19-JA-12, 19-JA-13, 19-JA-14, and 19-JA-15)

**MEMORANDUM DECISION**

Petitioner Mother S.W., by counsel Stephanie Nethken, appeals the Circuit Court of Monongalia County's August 19, 2019, order adjudicating her as an abusing parent of the children E.W.-D., E.W., A.M., and P.W.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Teresa J. Lyons, filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating her as an abusing parent and finding that there were aggravating circumstances.[2]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Prior to the initiation of the instant proceedings, petitioner was the subject of abuse and neglect proceedings due to her issues with domestic violence. In that proceeding, petitioner was granted a preadjudicatory improvement period and was provided services such as parenting and adult life skills classes. Ultimately, that petition was dismissed and the children were returned to her care in July of 2018.

In January of 2019, the DHHR filed the instant child abuse and neglect petition against petitioner alleging that she sexually abused E.W. and E.W.-D. Specifically, the DHHR alleged that

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]Petitioner does not assign as error the termination of her parental rights.

1

petitioner attempted to touch then-seven-year-old E.W.'s genitals and made sexual advances towards then-fifteen-year-old E.W.-D. The DHHR also alleged that following the dismissal of the prior abuse and neglect proceedings, petitioner sent A.M. and P.W. to Kentucky to live with A.M.'s paternal grandmother and had not seen them or provided emotional or financial support for them since.

The circuit court held an initial adjudicatory hearing in May of 2019. The DHHR presented the testimony of Officer Tyler Bradford of the Morgantown Police Department, who testified that he responded to petitioner's home regarding an incident of sexual abuse. Upon arriving at the home, E.W.-D. disclosed to Officer Bradford that petitioner came home drunk and discovered that E.W. had written on himself with marker. E.W.-D. told the officer that petitioner instructed E.W. to take a shower. At some point, E.W.-D. entered the bathroom and observed petitioner's head near E.W.'s genitals and heard petitioner tell E.W. to "stick it in." Officer Bradford testified that E.W.-D. reported that she subsequently locked herself in her bedroom and that petitioner began beating on her door, screaming "I want to f*ck you" to E.W. The DHHR additionally presented the testimony of Officer Chad Webster of the Morgantown Police Department, who testified that he also responded to petitioner's home regarding the incident of alleged sexual abuse. Officer Webster testified that, upon arriving at the home, he spoke with E.W., who was outside of the home in cold weather, did not have a shirt or shoes on, and had urinated on himself. Officer Webster stated that E.W. reported that petitioner instructed him to take a shower and that while he was in the shower, she began to touch his private parts. The child further pointed towards his groin while saying "private parts." E.W. also disclosed that, after petitioner touched him, he told her that he did not like that and asked her to stop. Petitioner then "bashed" his shoulder. E.W. fled from the bathroom and hid under the table until he heard petitioner yelling for him. He then ran out of the house and approached a neighbor's house for help but ran to the police when they arrived.

The DHHR then called Carly Wears, a therapist and forensic interviewer with the local Children's Advocacy Center ("CAC"). Ms. Wears testified that she was a therapist for E.W.-D., who informed her that petitioner came home on the night of the incident and passed out on the living room floor due to her intoxication. Petitioner later asked E.W.-D. to turn the shower on for E.W. Petitioner then tried to shut E.W.-D. out of the bathroom. E.W.-D. reported to Ms. Wears that she entered the bathroom and observed petitioner attempting to "suck" her brother's penis. E.W.-D. further reported that petitioner screamed at E.W.-D. that she wanted to "f*ck" her and "make [her] feel good." Ms. Wears opined that E.W.-D. had not been coached and believed her disclosures were genuine. Ms. Wears also testified that she performed the forensic interview of E.W. According to Ms. Wears, E.W. refused to disclose sexual abuse during the interview, although he did describe petitioner as "unsafe." However, Ms. Wears testified that, during the mental health screening she performed immediately after the interview, E.W. reported that petitioner had been drunk and acting crazy and that she had written something on him. E.W. further stated, "I did not lie to the police."

The DHHR also called a Child Protective Services ("CPS") worker who testified that petitioner abandoned her two younger children by leaving them in Kentucky with A.M.'s paternal grandmother around July of 2018, without providing emotional or financial support. After the CPS worker's testimony, the circuit court continued the hearing.

2

In July of 2019, the circuit court took the in-camera testimony of E.W.-D. The child testified that she did not believe petitioner should regain custody of her children because she "raped" E.W. The child further explained that petitioner came home drunk on the night of the incident and instructed her to start a shower for E.W. E.W.-D. stated that petitioner groped her and inappropriately touched E.W. E.W.-D. described petitioner as "absolutely wasted" and stated that petitioner was "making like the worst comments that I could ever like think." E.W.-D.'s testimony regarding petitioner's actions and statements towards her was consistent with the testimony of Ms. Wears. E.W.-D. also testified that she pulled E.W. off of petitioner and instructed him to "just get out. Just run as far as you can. People are going to come and get you. Just run. Just get away." E.W.-D. contacted a friend to call the police and waited in her bedroom until they arrived. E.W.-D. stated that she opened her window when the police arrived and pointed to where E.W. was hiding outside. E.W.-D. testified that the situation was "really messed up" and that she "never want[ed] to deal with it again." After the in-camera testimony, the circuit court continued the adjudicatory hearing.

The circuit court reconvened the adjudicatory hearing for a final time in August of 2019. Petitioner presented the testimony of three service providers who testified to the services petitioner received during her prior abuse and neglect case. The service providers testified that they observed no incidents of sexual abuse or intoxication during their sessions with petitioner in the prior proceedings and noted that petitioner complied with services. Petitioner also presented the testimony of her coworker, who testified that she was with petitioner on the night of the incident. The coworker testified that they drank a few beers and shots of alcohol at a bar to celebrate petitioner's birthday. The coworker's mother then drove them to petitioner's home, where the coworker assisted petitioner to her door due to her intoxication. The coworker also testified that she overheard E.W.-D. arguing with petitioner earlier in the evening when she arrived to pick petitioner up. The coworker stated that E.W.-D. was angry that petitioner asked her to watch E.W. while petitioner went out.

Lastly, petitioner testified on her own behalf. Petitioner stated that she left A.M. and P.W. with A.M.'s paternal grandmother in Kentucky around October of 2018, and that she provided documentation for them to receive medical treatment while in the paternal grandmother's care. Petitioner claimed that the children were to be returned to her around December of 2018 so that they could be reunited for Christmas. According to petitioner, she did not abandon A.M. and P.W. Petitioner conceded that she received help from A.M.'s paternal grandmother and that she could not personally go to Kentucky to visit the children. However, petitioner claimed that the grandmother brought the children back to visit her once in November of 2018. Regarding the night of the incident, petitioner testified that she followed E.W. to the shower to "get the marker off of him." Petitioner stated that she remembered that E.W. got upset, started screaming, and got out of the shower. After the child ran from the bathroom, petitioner got into the shower and did not follow E.W. Petitioner denied touching the child's genitals, even to wash him, and further stated that E.W.-D. was never in the bathroom with them. Petitioner also denied screaming that she wanted to "f*ck" E.W.-D. Petitioner noted that E.W.-D.'s stories had changed throughout the proceedings. According to petitioner, E.W.-D. first said she did not observe petitioner touch E.W., but later said that she had to pull E.W. off of petitioner.

3

After petitioner's presentation of testimony, the guardian presented the testimony of O.H., one of the family members E.W.-D. called on the night of the incident. O.H. testified that she received text messages and a phone call from E.W.-D. asking for help on the night of the incident. O.H. stated that E.W.-D. was "crying hysterically" and told her that petitioner was "hurting" E.W. O.H. went to petitioner's house to retrieve the children and, upon her arrival, E.W.-D. informed her that petitioner "came home drunk" and "pulled [E.W.'s] pants down and started sucking" his penis.

Following the close of evidence, the circuit court adjudicated petitioner as an abusing parent. In making its findings, the circuit court found that petitioner "abused and/or neglected the children" due to her failure to provide financial and emotional support. The circuit court further found that petitioner perpetrated sexual abuse on E.W. and E.W.-D. The circuit court noted that E.W.-D.'s in-camera testimony was the "most credible testimony due to her complete honesty." It is from the August 19, 2019, adjudicatory order that petitioner appeals.[3]

The Court has previously established the following standard of review in cases such as this:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in adjudicating her as an abusing parent. Specifically, petitioner claims that the DHHR failed to prove by clear and convincing

---

[3]During a later-held dispositional hearing, petitioner's parental rights to the four children were terminated. E.W.-D.'s father is deceased, and she was placed in the home of her maternal grandmother. The permanency plan for E.W.-D. is adoption by the maternal grandmother. P.W.'s father voluntarily relinquished his parental rights below. P.W. is currently placed with E.W.-D. in the maternal grandmother's home, but the permanency plan for P.W. is adoption by a maternal aunt once an Interstate Compact for the Placement of Children is completed. E.W.'s father successfully completed a preadjudicatory improvement period during the proceedings below, and E.W. has been placed in his care with a permanency plan of remaining with his father. A.M. has been placed with his father, who was deemed a nonabusing parent below, and the permanency plan for A.M. is to remain in his care.

evidence that she sexually abused E.W. and E.W.-D. Petitioner claims that the children's disclosures regarding what occurred are inconsistent. Petitioner notes that E.W.-D. did not initially tell responding officers that petitioner touched E.W. However, E.W.-D. later changed her story and told O.H. that petitioner attempted to "suck" E.W.'s penis. Thereafter, E.W.-D. told the circuit court that petitioner raped her brother. Petitioner claims that these inconsistencies render E.W.-D.'s disclosures incredible. Petitioner contends that E.W.'s disclosures were likewise incredible. At first, E.W. told police officers that his mother touched him inappropriately and that he had written all over himself with a marker. Thereafter, E.W. refused to disclose any abuse during a forensic interview. However, during a mental health screening, E.W. stated that petitioner inappropriately touched him, but that petitioner was the one who drew on him. Additionally, petitioner claims that, although the evidence showed that she was intoxicated when police arrived, she was coherent enough to ask why they were there. Accordingly, she was not so intoxicated that she could not remember the events of the evening. Petitioner claims that the circuit court "should have taken all the inconsistencies of the children['s] statements and the fact that [petitioner] did not know why the police were at her home when finding abuse and neglect with aggravated circumstances" and that "[i]t is clear that the [c]ourt could not establish a firm belief or conviction that the allegations actually occurred."[4]

Regarding A.M. and P.W., petitioner claims that the circuit court erred in adjudicating her as an abusing parent when there was insufficient evidence to find that she abandoned them. Petitioner states that although the CPS worker testified that A.M.'s paternal grandmother had had the children in her care since July of 2018, the DHHR never presented the testimony of the grandmother to determine whether that was true. Further, petitioner testified that she had contact with the children and that they had only been in the grandmother's care since October of 2018. Petitioner also contends that she saw the children in November of 2018 and that the children were to return to her care in December of 2018. Petitioner states that "[b]ecause she kept in contact with the children[,] had Christmas presents ready for them when they were to return[,] and kept in contact with [the grandmother]" she did not engage in conduct that demonstrated she intended to "forego her duties and responsibilities as a parent."

---

[4]Petitioner claims that the circuit court should not have found that there were aggravated circumstances in this case. West Virginia Code § 49-4-604(7)(A) (2019) provides:

> (7) For purposes of the court's consideration of the disposition custody of a child pursuant to this subsection, the department is not required to make reasonable efforts to preserve the family if the court determines:
>
> (A) The parent has subjected the child, another child of the parent or any other child residing in the same household or under the temporary or permanent custody of the parent to aggravated circumstances which include, but are not limited to, abandonment, torture, chronic abuse, and sexual abuse[.]

As set forth more fully above, we find no error in the circuit court's determination that petitioner perpetrated sexual abuse upon E.W. and E.W.-D. Because aggravated circumstances include instances of sexual abuse, we find no error in the circuit court's finding that aggravated circumstances were present in the instant case.

Having reviewed the record, we find no merit in petitioner's arguments and further find that there was sufficient evidence to adjudicate petitioner as an abusing parent with regard to all four children. We have said:

> At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id.* at 546, 759 S.E.2d at 777 (citing *Brown v. Gobble*, 196 W. Va. 559, 564, 474 S.E.2d 489, 494 (1996)). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* at 546, 759 S.E.2d at 777 (quoting *Cramer v. W. Va. Dep't of Highways*, 180 W. Va. 97, 99 n.1, 375 S.E.2d 568, 570 n.1 (1988)).

Pursuant to West Virginia Code § 49-1-201, an abused child includes one whose health or welfare is being threatened by sexual abuse. Further, West Virginia Code § 49-1-201 defines a "neglected child" as a child

> [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when that refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian.

We first address petitioner's claims that there was insufficient evidence to adjudicate her as an abusing parent with regard to E.W. and E.W.-D. Contrary to petitioner's claims, the children's disclosures were not so inconsistent as to render them incredible. E.W.-D. told police that she observed petitioner's head near E.W.'s groin and heard her say "stick it in." When O.H. arrived on the scene later that evening, E.W.-D. reported that petitioner attempted to perform oral sex on E.W. E.W.-D. also told Ms. Wears, her therapist, that petitioner attempted to perform oral sex on E.W. While petitioner notes that E.W.-D. told the circuit court that petitioner attempted to rape E.W., it is clear that E.W.-D. went on to give a more exact description of the events and explained that petitioner had inappropriately touched E.W. E.W.'s disclosures were likewise consistent. E.W. told police that his mother touched his "private parts" and motioned towards his genitals. Although E.W. refused to make any disclosure during the forensic interview, in the mental health screening performed immediately after the interview he stated that he did not lie to the police regarding his disclosures. As such, it is clear that the children's disclosures of sexual abuse were consistent throughout the proceedings.

6

To the extent petitioner claims that her testimony, or that of her witnesses, was more credible than that of E.W.-D. and other DHHR witnesses, we note that the circuit court found otherwise. Specifically, the circuit court found that E.W.-D. was the "most credible" and that she testified with "complete honesty." Moreover, we note that "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) (citations omitted). During the proceedings below, the circuit court weighed all of the testimony presented and determined that "the testimony of [E.W.-D.] . . . was more credible than that of [petitioner]." Accordingly, we decline to reassess the circuit court's credibility determinations, and we find that it properly adjudicated petitioner as an abusing parent with regard to E.W. and E.W.-D. based upon the evidence and testimony presented.

We likewise find that there was sufficient evidence to adjudicate petitioner as an abusing parent with regard to A.M. and P.W. First, we note that contrary to petitioner's claims, the circuit court did not adjudicate petitioner based upon abandonment. Rather, the circuit court found that petitioner abused and/or neglected the children based upon her failure to provide financial or emotional support. Indeed, the CPS worker testified that, during the course of her investigation, she discovered that petitioner left the children in the care of A.M.'s paternal grandmother shortly after the dismissal of her prior abuse and neglect proceeding and had not provided them with emotional or financial support since that time. As noted above, the definition of a neglected child is one whose "physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply the child with necessary food, clothing, shelter, supervision, medical care or education." W. Va. Code § 49-1-201. Again, petitioner's argument largely centers on the circuit court's credibility determination. Petitioner claims that her testimony demonstrated that P.W. and A.M. had only been residing in Kentucky since October of 2018, that she saw the children in November of 2018, and that they were to return to her care in December of 2018. However, as we set forth above, this Court will not reassess credibility determinations. *Michael D.C.*, 201 W. Va. at 388, 497 S.E.2d at 538. Here, the circuit court heard the testimony of both the CPS worker and petitioner and afforded their testimony weight as it saw fit. Accordingly, we find no error in this regard.

In sum, the evidence presented below was sufficient to demonstrate that petitioner abused and/or neglected all four of her children. Therefore, we find no error in the circuit court's adjudication of petitioner as an abusing parent. Petitioner is entitled to no relief.

Lastly, because permanent placement for the child P.W. has not yet been achieved, this Court reminds the circuit court of its duty to establish permanency for the child. Rule 39(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings requires:

> At least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

Further, this Court reminds the circuit court of its duty pursuant to Rule 43 of the Rules of Procedure for Child Abuse and Neglect Proceedings to find permanent placement for the child within twelve months of the date of the dispositional order. As this Court has stated,

> [t]he [twelve]-month period provided in Rule 43 of the West Virginia Rules of Procedure[] for Child Abuse and Neglect Proceedings for permanent placement of an abused and neglected child following the final dispositional order must be strictly followed except in the most extraordinary circumstances which are fully substantiated in the record.

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, syl. pt. 6. Moreover, this Court has stated that

> [i]n determining the appropriate permanent out-of-home placement of a child under [West Virginia Code § 49-4-604(b)(6) (2019)[5]], the circuit court shall give priority to securing a suitable adoptive home for the child and shall consider other placement alternatives, including permanent foster care, only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests or where a suitable adoptive home [cannot] be found.

Syl. Pt. 3, *State v. Michael M.*, 202 W. Va. 350, 504 S.E.2d 177 (1998). Finally, "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." Syl. Pt. 5, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 19, 2019, order is hereby affirmed.

Affirmed.

**ISSUED**: June 24, 2020

**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

---

[5]Although the Legislature amended West Virginia Code § 49-4-604 effective June 5, 2020, including renumbering the provisions, the amendments do not impact this case.