**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **B.C., A.H., and C.C.**

**No. 21-0631** (Putnam County 21-JA-8, 21-JA-9, and 21-JA-10)

**MEMORANDUM DECISION**

Petitioner Mother T.H., by counsel Brenden D. Long, appeals the Circuit Court of Putnam County's July 30, 2021, order terminating her parental rights to B.C., A.H., and C.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Elizabeth Davis, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in denying her request for an improvement period and terminating her parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In January of 2021, the DHHR filed an abuse and neglect petition against petitioner and the father of C.C. alleging that C.C. was born drug-exposed and had been hospitalized since her premature birth in October of 2020. The DHHR alleged that petitioner was admitted to the hospital in October of 2020 for hypertension, at which time she tested positive for amphetamine, methamphetamine, benzodiazepine, and antidepressants. According to the petition, petitioner denied abusing any controlled substances and stated that benzodiazepine was in her system due to Zoloft and that methamphetamine was in her system due to Sudafed. The DHHR alleged that petitioner also tested positive for these substances several times throughout September of 2020, and petitioner had not previously reported the use of Zoloft or Sudafed. The DHHR alleged that

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

petitioner had been involved with Child Protective Services ("CPS") for several months, and that she reported ceasing the use of Percocet and benzodiazepine since February of 2020. According to the petition, petitioner's discussion of her substance abuse changed on a daily basis, and she provided differing accounts to multiple individuals. After C.C.'s premature birth, petitioner told one CPS worker that she did not know how she tested positive for multiple controlled substances and stated that her mother had been feeding her methamphetamine. The CPS worker also visited the parents' home and noted that the residence was extremely cluttered and appeared as though no one lived there. The worker explained to the parents that they needed to clean and prepare the home for the arrival of C.C. The worker also explained to the parents that if petitioner's mother was drugging them while petitioner was pregnant with C.C., they needed to contact law enforcement.

Later in October of 2020, the CPS worker informed petitioner that there was no evidence that she had ever contacted law enforcement to report that her mother had drugged her during her pregnancy with C.C. At that point, petitioner began to "break down" and disclosed to the worker that she abused methamphetamine throughout her pregnancy with C.C., including the day she was admitted to the hospital for the child's premature birth. Petitioner also admitted to using methamphetamine on one occasion while in the hospital. According to the petition, C.C. was still on "all of the tubes" in November of 2020 to assist her but was continuing to make progress. Later that month, CPS workers visited the parents' home to discuss a proposed safety plan for the child. At the time, petitioner acknowledged her drug abuse and agreed to attend an inpatient drug rehabilitation facility where C.C. could possibly be placed with her. The CPS workers also found the parents' home to be cluttered with "trash, junk, and animals." The DHHR alleged that there were several kittens in the home and a foul smell of decomposition. The porch was also cluttered with junk, the kitchen ceiling appeared to be caving in, and the floor had a piece of plywood covering a hole. The CPS workers also inquired about cockroaches in the home and an inaccessible, nonworking bathroom toilet. The workers further observed minimal items for an infant child, and the workers explained to the parents that work needed to be done before C.C. could live at the residence. At the end of November of 2020, nursing staff disclosed that the child was unable to appropriately bond with petitioner because her visits were "so short and inconsistent." The nursing staff also disclosed that the child would likely have special needs.

According to the petition, the DHHR began providing services to petitioner in January of 2021. A service provider visited the parents' home that month and noted several safety concerns inside the home. The DHHR alleged that they were the same concerns noted during a CPS worker's visit to the residence in November of 2020. The service provider noted that the shower did not work and the home lacked running water. The service provider also indicated that there were several holes in the ceiling and the home was still infested with cockroaches. According to the petition, a CPS worker received an email from a social worker at the hospital indicating that C.C. was almost ready to be discharged. The social worker indicated that petitioner was inconsistent with visiting with the child or receiving education. Finally, the DHHR alleged that petitioner had failed to provide for physical, emotional or financial needs of older children B.C. and A.H., and had abandoned them. At the time of the petition, the DHHR stated that B.C. was living with her nonabusing father, and A.H. was residing with his maternal grandfather.

The circuit court held an adjudicatory hearing in March of 2021, during which petitioner stipulated to abusing and neglecting the children. Specifically, petitioner stipulated to exposing C.C. to her drug use, as she used controlled substances during her pregnancy with the child and the child was born premature and drug-exposed. Petitioner further stipulated that her drug use seriously impaired her parenting skills and abilities; that the conditions of her home were deplorable and unsafe for C.C. to live in; that she did not participate in necessary training at the hospital to ensure she knew how to care for the special needs of C.C., once C.C. was discharged from the hospital; that she failed to provide for the physical, emotional, or financial needs of the children B.C. and A.H.; that she had abandoned B.C. and A.H.; and that her actions harmed and/or threatened the physical and/or mental health of the children. The circuit court accepted petitioner's stipulation and adjudicated her as an abusing parent. Petitioner then moved for a post-adjudicatory improvement period, which the court held in abeyance.

The guardian filed a report recommending the termination of the parents' parental rights in April of 2021. The guardian indicated that the parents' home was unsafe for C.C. and that the parents had not been cooperative with services or service providers. Specifically, the guardian noted that the parents had missed twelve sessions with Children's First providers since January of 2021. The report also indicated that petitioner tested positive for opioids. The guardian further indicated that then seven-year-old B.C. and five-year-old A.H. had not seen petitioner in over three years. Accordingly, the guardian recommended that it was in the children's best interests to deny the parents' motions for improvement periods and to terminate their parental rights.

In June of 2021, the circuit court held a final dispositional hearing wherein petitioner did not initially appear but later appeared by telephone. At the hearing, the DHHR put on evidence that the parents had not made any progress on the conditions of their home, and that the residence was still unsafe for a newborn child. The DHHR further demonstrated that the parents had not cooperated with service providers or participated in services throughout the proceedings. The DHHR further presented evidence that it had sent the parents noncompliance letters, and that the parents had no contact with DHHR or with service providers since the adjudicatory hearing and had not participated in drug screens since the hearing.

Based upon the presentation of evidence, the circuit court found that the parents had failed to cooperate with services and service providers, and that there was no evidence that they would substantially comply with an improvement period and denied their motions for the same based on the evidence presented. The court found that the parents failed to avail themselves of treatment services and were not amenable to treatment at the time. The court further found that continuation in the home was not in the best interests of the children because the parents were unable or unwilling to care for or provide for the children. Finally, the court found that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the foreseeable future. Accordingly, the circuit court terminated petitioner's parental rights to the children.[2] It is from the July 30, 2021, dispositional order that petitioner appeals.

_____

[2]C.C.'s father's parental rights were terminated below. The permanency plan for the child is adoption by her foster family. B.C.'s father is a nonabusing parent and the child has achieved permanency in his care. A.H.'s paternity is unknown and proceedings regarding the father remain ongoing. The permanency plan for the child is guardianship by the maternal grandfather.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner alleges that the circuit court erred in terminating her parental rights without giving her additional time to participate in an improvement period. Petitioner argues that the DHHR "did not provide services to [her] to help fix her deplorable and unsafe living situation to make it habitable and suitable for her child." Petitioner further asserts that granting her a post-adjudicatory improvement period would have given her "up to six months to work on her drug issues, complete inpatient drug rehabilitation, complete any training still required for her child, show that her new housing was habitable and suitable for a child, and successfully comply with services." In light of this, petitioner argues that she should have been afforded the opportunity to participate in an improvement period. We disagree.

West Virginia Code § 49-4-610(2)(B) provides that the circuit court may grant a parent a post-adjudicatory improvement period when the parent "demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period." Further, "[t]his Court has explained that 'an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the . . . parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged.'" *In re Kaitlyn P.*, 225 W. Va. 123, 126, 690 S.E.2d 131, 134 (2010) (citation omitted). However, the circuit court has discretion to deny an improvement period when no improvement is likely. *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002).

On appeal, petitioner focuses her argument primarily on the timeframe, arguing that additional time would allow her to comply with services and achieve reunification with the children. However, petitioner failed to participate in any services designed to remedy her substance abuse during the proceedings. While petitioner contends that the DHHR failed to provide her with services that would have remedied the conditions of abuse and neglect, her argument ignores the fact that she failed to avail herself of any services offered to her below. Indeed, the DHHR demonstrated at the dispositional hearing that petitioner failed to maintain contact with the DHHR and service providers throughout the proceedings, and failed to participate in drug screens as

4

ordered by the circuit court. The guardian indicated in her report that petitioner missed twelve sessions with Children's First service providers between January of 2021 and April of 2021. The guardian further indicated that A.H. and B.C. had not seen petitioner in over three years.

Despite petitioner's argument that she would have substantially complied with services and corrected the conditions of abuse and neglect, the record shows that she largely failed to participate in services during the proceedings and, thus, failed to satisfy the burden of proof necessary to obtain an improvement period. Further, given petitioner's willful refusal to participate in services designed to remedy the conditions of abuse and neglect, it is disingenuous for her to now assert that she would have corrected the conditions of abuse and neglect if granted a post-adjudicatory improvement period during the proceedings below. Petitioner's actions in refusing to participate in drug screenings, attend appointments with service providers, or stay in communication with the DHHR established that improvement was unlikely. As such, we find no error in the circuit court's denial of petitioner's motion for an improvement period.

Next, petitioner argues that the circuit court erred in terminating her parental rights because there was insufficient evidence to find that there was no reasonable likelihood that the conditions of abuse and neglect could not be corrected in the near future or that termination was necessary for the children's welfare, the two findings required for termination of parental rights under West Virginia Code § 49-4-604(c)(6). We find, however, that the substantial evidence laid out above supports termination as well. Specifically, petitioner's failure to participate in even the meager requirement of submitting to drug screens establishes that she failed to follow through with or respond to the reasonable family case plan in this matter, which constitutes a situation in which there is no reasonable likelihood the conditions of abuse and neglect can be substantially corrected under West Virginia Code § 49-4-604(d)(3). Additionally, given petitioner's repeated abuse of substances and lack of contact with the older children, it is clear that the children's welfare required termination of her rights. This Court has held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As such, it is clear that the circuit court did not err in terminating petitioner's parental rights.

Lastly, because the proceedings in circuit court regarding A.H.'s unknown father remain ongoing, this Court reminds the circuit court of its duty to establish permanency for the child. Rule 39(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings requires that

> [a]t least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress

5

and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

Further, this Court reminds the circuit court of its duty pursuant to Rule 43 of the Rules of Procedure for Child Abuse and Neglect Proceedings to find permanent placement for the child within twelve months of the date of the disposition order. As this Court has stated,

> [t]he [twelve]-month period provided in Rule 43 of the West Virginia Rules of Procedure[] for Child Abuse and Neglect Proceedings for permanent placement of an abused and neglected child following the final dispositional order must be strictly followed except in the most extraordinary circumstances which are fully substantiated in the record.

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 6. Moreover, this Court has stated that

> [i]n determining the appropriate permanent out-of-home placement of a child under [West Virginia Code § 49-4-604(c)(6)], the circuit court shall give priority to securing a suitable adoptive home for the child and shall consider other placement alternatives, including permanent foster care, only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests or where a suitable adoptive home [cannot] be found.

Syl. Pt. 3, *State v. Michael M.*, 202 W. Va. 350, 504 S.E.2d 177 (1998). Finally, "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." Syl. Pt. 5, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

For the foregoing reasons, we find no error in the decision of the circuit court and its July 30, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: February 1, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton