**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **J.C., K.C., M.C.-1, and M.C.-2**

**No. 21-1036** (Randolph County 20-JA-105, 20-JA-106, 20-JA-107, and 20-JA-108)

**MEMORANDUM DECISION**

Petitioner Mother C.C., by counsel Melissa T. Roman, appeals the Circuit Court of Randolph County's December 3, 2021, order terminating her parental rights to J.C., K.C., M.C.-1, and M.C.-2.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Andrew T. Waight, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Heather M. Weese, filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Relevant to the instant case, petitioner and the children were the subject of a family court proceeding, during which Child Protective Services ("CPS") became involved. For reasons not apparent from the petition, petitioner's two children M.C.-1 and M.C.-2 were placed or left with their paternal grandparents, and the grandparents became unable to properly care for the children

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because two of the children share the same initials, we will refer to them as M.C.-1 and M.C.-2, respectively, throughout this memorandum decision.

1

due to the grandparents' age and medical conditions.[2] In September of 2019, the DHHR received a referral that M.C.-1 and M.C.-2 were frequently observed to be unkempt and dirty and that a mass or knot had been allowed to form in M.C.-2's hair to such a degree as to cause the child pain.

CPS workers investigated the referral and observed the mass in the child's hair, which appeared to have been glue or slime that solidified into a hard knot. A CPS worker spoke to the children's guardian, who had been appointed at some point during the family court proceedings, and the guardian informed the worker that petitioner had been granted supervised visits with M.C.-1 and M.C.-2 but that she had not consistently visited with the children, despite having been ordered by the family court to do so.[3]

The DHHR alleged that, at a family court hearing held in February of 2020, the family court ordered petitioner to become more consistent with visiting M.C.-1 and M.C.-2 and that visits were to be supervised by the father or the paternal grandmother. Around August of 2020, the guardian learned that petitioner had been exercising unsupervised visits with M.C.-1 and M.C.-2 against the family court's order. Petitioner reported to the guardian that then-twelve-year-old M.C.-1 had been in her home "off and on for weeks" and that the child had been exhibiting concerning behavior, such as stealing the paternal grandmother's debit card and inserting objects into her vagina, causing injury.

A CPS worker visited petitioner's home unannounced and observed the home to be in deplorable condition, with trash strewn throughout the home and a roach infestation. Further, petitioner owned eleven cats and one dog, and the smell of animal urine was overwhelming. Petitioner admitted to the CPS worker that her two younger children, J.C. and K.C., were living in the home and that, although not currently present, they would return with their father later that evening. Based on the conditions of the home, the worker sought ratification to remove the children. Later, the worker discovered that, at some point, K.C. had been taken to her maternal grandparents' home in Ohio, which was concerning given that the maternal grandparents' parental rights to their three children, including petitioner, had been previously terminated.

Lastly, the DHHR learned that petitioner had been involved in a prior abuse and neglect proceeding as a nonabusing parent but received services throughout the course of that proceeding. The DHHR filed the instant child abuse and neglect petition against petitioner in August of 2020, raising the abovementioned allegations. Petitioner waived her preliminary hearing. At an adjudicatory hearing held in October of 2020, petitioner stipulated to the allegations contained in the petition. The circuit court accepted petitioner's stipulation and adjudicated her as an abusing parent. In December of 2020, the circuit court granted petitioner a post-adjudicatory improvement

---

[2]Petitioner reported in her later-held psychological evaluation that when she ended her relationship with M.C.-1 and M.C.-2's father, he was granted custody of the children due to her being homeless, but she was granted visitation. The father and the two children lived with the paternal grandparents. However, there are no family court orders in the appendix record to corroborate these claims.

[3]It is unclear why petitioner was granted supervised, rather than unsupervised, visits with the children.

period, the terms of which required her to participate in parenting and adult life skills classes, counseling, and a psychological evaluation; obtain and maintain housing and employment; and submit to drug screens prior to supervised visits with the children.

In February of 2021, the DHHR filed an amended petition against petitioner after the children underwent Child Advocacy Center ("CAC") interviews. According to the DHHR, K.C., then approximately age eight, reported being sexually abused by her maternal grandfather while in Ohio. The child further reported that her parents abused marijuana, described the pipe they used to smoke the substance, and stated that her parents kept loaded firearms within their reach in the home. During his interview, J.C., then approximately age seven, denied any sexual abuse or drug abuse in the home, but admitted that his father frequently yelled at the child's uncle, who frequented the home. Following the CAC interviews, K.C. reported to her foster family that her father also sexually abused her, and J.C. reported to his foster family that he lied and had not told the truth during his interview. As such, additional interviews were scheduled. The DHHR also alleged that, after supervised visits with the parents, J.C. and K.C. exhibited concerning behavioral issues. J.C. urinated on the bathroom floor and in a cup, both children defecated in their pants, both children threw toilet paper with feces on the floor, and K.C. destroyed makeup and wrote on the foster family's couch with a marker, among other behaviors. During M.C.-2's interview, the child initially refused to cooperate, but eventually reported that her father touched her vagina. The DHHR reported that M.C.-2 also exhibited concerning behaviors, such as making inappropriate sexual statements and attempting to touch the foster mother's breasts under her shirt.

The circuit court held an adjudicatory hearing on the amended petition in April of 2021. Petitioner stipulated to the allegations contained in the amended petition, and the circuit court adjudicated her as an abusing parent.

In November of 2021, the circuit court held a dispositional hearing. Petitioner requested an extension to her improvement period and presented the testimony of Dr. Kevin Junkins, a psychiatrist with Community Care of West Virginia. Dr. Junkins testified that he began seeing petitioner in February of 2020 for medication management and psychotherapy. Dr. Junkins stated that petitioner was "very compliant" with services and opined that she would continue making progress in therapy. Dr. Jenkins estimated that petitioner needed an additional six months to a year of services to address her mental health diagnosis and parenting skills deficits.

A service provider testified that petitioner missed ten out of twenty-three scheduled parenting classes. She further testified that, although petitioner organized the home, there were nearly twenty cats and multiple dogs in the home, more than when the petition was filed.

Petitioner testified and requested additional time to complete her improvement period. Petitioner stated that she participated in supervised visitation with the children and in parenting and adult life skills classes. Petitioner stated that the visits with the children went well and that she was learning during her classes. Petitioner acknowledged that she did not have employment but stated she had applied to twenty or thirty jobs during the proceedings. Petitioner admitted that her home was still not suitable for the children and requested additional time and funds to fix and clean the home. On cross-examination, petitioner claimed she missed some services because she was working at the time during the proceedings and could not answer her phone. Petitioner also

3

admitted that she had been offered visitation in M.C.-1's foster home but that she did not take that opportunity, claiming she did not know the address. Petitioner denied having knowledge that her father, the children's maternal grandfather, was a threat to her children and stated that he had never sexually abused her. Petitioner claimed that she did nothing wrong in sending K.C. to visit the maternal grandparents and suggested that the child was never alone with the grandfather. She further claimed that she did not believe the sexual abuse had occurred because the child never reported the abuse to her and that petitioner "had her checked by a doctor saying that she was never abused." However, petitioner admitted that during her husband's prior abuse and neglect proceedings, CPS workers instructed her to supervise any visits between the maternal grandfather and her children due to his history of sexual abuse. Regarding the conditions of her home, petitioner claimed that her home was in poor condition because her son, J.C., was "off his medication" and "destroy[ed] the house." When asked what she would fix during an additional improvement period given that she blamed J.C. for the mess in her home, petitioner stated she would teach the child to clean up after himself. She further stated, "[T]hat is what I was doing before you guys ripped him out of my house."

The DHHR presented the testimony of a CPS worker who testified that, as of her last visit to petitioner's home, the home was not in suitable condition for the children. The CPS worker testified that the house was very cluttered, that there was dog feces on the floor, and that trash was piled on the porch. The worker also observed what she believed to be human feces down the outside of the toilet. The worker expressed concern over the number of animals in the home, including three or four dogs and as many as fifteen cats. According to the worker, the home "just reeked of urine and feces" and had a "mold odor." The worker also testified that, during the 2012 proceedings, that petitioner, although a nonoffending respondent, was offered parenting and adult life skills classes over the course of approximately eighteen to twenty-two months. During those proceedings, petitioner acknowledged that her father was a registered sex offender and that she was not supposed to leave her children unsupervised in his care, but, nevertheless, allowed K.C. to stay in the maternal grandparents' home, resulting in sexual abuse by the grandfather.

M.C.-1's foster mother testified that, due to staffing difficulties with the DHHR, she offered to supervise visits between petitioner and M.C.-1, and at some point, offered to supervise visits with M.C.-2 at the residential facility where the child was residing at the time. However, petitioner never took advantage of the opportunity and never visited either of the children with the foster mother's assistance. The foster mother reported listening to phone conversations between M.C.-1 and petitioner wherein M.C.-1 would ask petitioner to come visit, and petitioner would always provide an excuse as to why she could not visit the child, such as lack of money, being out of state, or having obtained more dogs. The foster mother further stated that, during one phone call, petitioner yelled at M.C.-1 and hung up on her.

At the conclusion of the hearing, the court found that petitioner had participated in two separate parental fitness evaluations performed a year apart and that both resulted in a guarded prognosis for improved parenting despite two years of treatment from Dr. Junkins. The court further noted that Dr. Junkins believed that petitioner needed long-term treatment to address her issues. The court was unconvinced that petitioner could improve her circumstances in a timely manner and noted that petitioner missed ten out of twenty-three scheduled parenting classes. The court found that testimony demonstrated that the poor home conditions had not been completely

remedied and that petitioner blamed J.C. for the condition of the home. Petitioner's failure to recognize her responsibility in the matter caused the court concern, as did petitioner's willingness to expose her children to the same individual who abused her as a child. As such, the court opined that there was no indication that any further improvement period would assist petitioner in remedying the issues of abuse and/or neglect. Based on the forgoing, the court denied petitioner's request for an additional improvement period and terminated her parental rights to the children upon finding that there was no reasonable likelihood that she could correct the conditions of abuse and neglect in the near future. Petitioner appeals the circuit court's December 3, 2021, order terminating her parental rights.[4]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in terminating her parental rights when the record shows that the DHHR failed to provide petitioner with a meaningful improvement period. Petitioner argues that pursuant to West Virginia Code § 49-4-610, she was eligible for up to eighteen months of services through an improvement period and that her improvement period should have been extended. According to petitioner, she was making substantial progress in her improvement period and had taken steps to repair the home, but her financial situation made it impossible to make any improvement quickly. The DHHR had the financial means to assist petitioner but never offered her any assistance in that regard. Moreover, the CPS worker admitted during her testimony that she had not been to the home in nearly six months as of the dispositional hearing and that petitioner had not been able to visit the children for several weeks due to administrative issues. Petitioner avers that Dr. Junkins opined that petitioner was compliant with services and would make progress with proper therapy. Based on the foregoing, petitioner contends that the DHHR failed to provide her with a meaningful improvement period and the circuit court should have afforded her more time to participate in services prior to terminating her parental rights.

---

[4]The fathers' parental rights to their respective children were terminated below. The permanency plan for the children is adoption in their respective foster homes.

5

We find petitioner's arguments to be without merit. We have previously held that

> "[p]ursuant to West Virginia Code § 49-[4-610(6) (eff. 2015)], before a circuit court can grant an extension of a post-adjudicatory improvement period, the court must first find that the respondent has substantially complied with the terms of the improvement period; that the continuation of the improvement period would not substantially impair the ability of the Department of Health and Human Resources to permanently place the child; and that such extension is otherwise consistent with the best interest of the child." Syl. Pt. 7, in part, *In re Isaiah A.*, 228 W. Va. 176, 718 S.E.2d 775 (2010) (per curiam).

Syl. Pt. 7, *State ex rel. P.G.-1 v. Wilson*, --W. Va. --, -- S.E.2d --, 2021WL 5355634 (2021).

Here, petitioner fails to establish that she was entitled to an extension of her improvement period. The record showed that petitioner missed ten of twenty-three scheduled parenting classes and, by her own admission, had not remedied the conditions in the home. While petitioner argues that the DHHR should have offered her financial assistance to fix the conditions of the home, testimony at the dispositional hearing established that petitioner continued to maintain several animals in the home and blamed the child J.C. for the conditions of the home—issues that would not be remedied with financial aid. This Court has held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Petitioner fails to address what additional services would have helped her recognize that the conditions of the home were her responsibility, not that of the child.

In addition to failing to accept responsibility for the conditions of the home, petitioner also failed to recognize her poor judgment in leaving K.C. in the care of a registered sex offender whose parental rights to petitioner were terminated when she was a child. Moreover, petitioner denied that any sexual abuse of K.C. had occurred despite the child's disclosures in her CAC interview. While petitioner argues that there was a lengthy period of time when visitation was not available, the record establishes that the foster mother and the DHHR accommodated petitioner by allowing the foster mother to supervise visits with M.C.-1 and M.C.-2, but petitioner failed to take advantage of that opportunity. Accordingly, based on the record before us, we cannot find that the court erred in denying petitioner an extension to her improvement period.

We likewise find no error in the circuit court's termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental, custodial, and guardianship rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(d) provides

that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "demonstrated an inadequate capacity to solve the problems of abuse or neglect on [his or her] own or with help."

In the instant case, the record establishes that petitioner demonstrated an inadequate capacity to solve the problems of abuse or neglect on her own or with help. Specifically, petitioner failed to adequately address the conditions of her home or her poor judgment. Petitioner failed to complete parenting or adult life skills classes or take advantage of the visitation opportunities offered through the foster mother. "We have previously pointed out that the level of interest demonstrated by a parent in visiting his or her children while they are out of the parent's custody is a significant factor in determining the parent's potential to improve sufficiently and achieve minimum standards to parent the child." *In re Katie S.*, 198 W. Va. 79, 90 n.14, 479 S.E.2d 589, 600 n.14 (1996) (citations omitted). Moreover, the record clearly establishes that petitioner blamed J.C. for the condition of the home, did not believe that she had subjected K.C. to any dangerous situations or that sexual abuse had occurred, and generally failed to accept responsibility for her actions, claiming the DHHR "ripped" the children out of her home. Although Dr. Junkins opined that petitioner could remedy her parenting issues in six months to a year with services, the court did not believe that petitioner would make progress with additional time. We have previously held that "[c]ourts are not required to exhaust every speculative possibility of parental improvement." *Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, syl. pt. 4 (citation omitted). Moreover,

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). The evidence set forth above demonstrates that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future and that termination of her parental rights was necessary for the children's welfare. Consequently, we find no error in the circuit court's decision to terminate petitioner's parental rights to the children.

For the foregoing reasons, we find no error in the decision of the circuit court, and its December 3, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: May 12, 2022

7

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn