## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **H.C., M.C.-1, M.C.-2, and M.C.-3**

**No. 21-1038** (Randolph County 20-JA-101, 20-JA-102, 20-JA-107, and 20-JA-108)

### MEMORANDUM DECISION

Petitioner Father M.C.-4, by counsel Gregory R. Tingler, appeals the Circuit Court of Randolph County's December 3, 2021, order terminating his parental rights to H.C., M.C.-1, M.C.-2, and M.C.-3.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Andrew T. Waight, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Heather M. Weese, filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing and neglectful parent.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Relevant to the instant case, petitioner and the children were the subject of a family court proceeding, in which Child Protective Services ("CPS") became involved. For reasons not apparent from the petition, M.C.-2 and M.C.-3 were placed or left with their paternal grandparents, and the grandparents became unable to properly care for the children due to their advanced ages

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because three of the children and petitioner share the same initials, we refer to them as M.C.-1, M.C.-2, M.C.-3, and M.C.-4, respectively, throughout this memorandum decision.

and medical conditions.[2] In September of 2019, the DHHR received a referral that M.C.-2 and M.C.-3 were frequently observed to be unkempt and dirty and that a mass or knot had been allowed to form in M.C.-3's hair to such a degree as to cause the child pain.

CPS workers investigated the referral and observed the mass in the child's hair, which appeared to have been glue or slime that solidified into a hard knot. A CPS worker spoke to the children's guardian, who had been appointed at some point during the family court proceedings, and the guardian informed the worker that petitioner used to live in the home with the paternal grandparents and provided care for the children. The guardian noted, however, that petitioner moved out of the grandparents' home and into a home with his girlfriend, T.R., after the couple experienced "the loss of a child." The guardian opined that petitioner's participation in parenting the children had significantly reduced and T.R. reportedly "did not want anything to do with [M.C.-2 and M.C.-3] and w[ould] not allow the children to go to [petitioner and T.R.'s] home."

The DHHR alleged that, in February of 2020, a CPS worker visited the home of the paternal grandparents, and observed clothing piled in various places throughout the living room and papers all over the floor and table of the dining room. The grandmother reported that petitioner did not help "as much as she needs him to" and did not financially support M.C.-2 and M.C.-3. That same day, the CPS worker proceeded to petitioner's home and was denied access. Petitioner spoke to the worker outside the home and confirmed that he did not provide the paternal grandparents with any financial support for M.C.-2 and M.C.-3 and that T.R. "did not want anything to do with his kids . . . and that she would not allow them to live in the home with them."

At a family court hearing held that same month, the family court ordered petitioner to assist the paternal grandparents in caring for M.C.-2 and M.C.-3. Around August of 2020, the guardian learned that M.C.-2 and M.C.-3's mother had been exercising unsupervised visits with them against the family court's order, which had required that visits be supervised by either petitioner or the paternal grandparents. The mother reported to the guardian that then-twelve-year-old M.C.-2 had been in her home "off and on for weeks" and that the child had been exhibiting concerning behavior, such as stealing the paternal grandmother's debit card and inserting objects into her vagina, causing injury. In response, the CPS worker visited the mother's home unannounced and observed the home to be in deplorable condition, with trash strewn throughout the home and a roach infestation.

After leaving the mother's home, the worker proceeded to petitioner and T.R.'s home and knocked on the door three times. The children opened the curtains and saw the worker, and the worker could hear an adult female's voice within the home, but no one answered the door. The worker observed a significant amount of trash piled outside the home and a toy kitchen covered in broken glass. The worker returned to the home on a later occasion, and petitioner and T.R. granted

---

[2]The mother of M.C.-1 and M.C.-2 reported in her later-held psychological evaluation that when she ended her relationship with petitioner, he was granted custody of the children due to her being homeless, but she was granted visitation. The father and the two children lived with the paternal grandparents. However, there are no family court orders in the appendix record to corroborate these claims.

the worker access to the home. The worker observed the home to have a significant roach infestation and the rooms were full of junk and trash. According to the worker, at least two rooms were inaccessible or very difficult to reach due to excessive clutter. The home also lacked sufficient food for the children, and the children were observed to have a significant amount of bug bites on their arms and legs. Based on the foregoing, the worker sought ratification to remove the children.

In October of 2020, the circuit court held an adjudicatory hearing. Petitioner stipulated to the allegations contained in the petition. Specifically, petitioner stipulated that he failed to provide for the children financially, failed to provide proper supervision, and failed to provide suitable housing. The circuit court accepted petitioner's stipulation and adjudicated him as an abusing parent.

In February of 2021, the DHHR filed an amended petition against petitioner. According to the DHHR, then-four-year-old H.C. began exhibiting concerning behaviors, including touching her genitals, which prompted the DHHR to schedule Child Advocacy Center ("CAC") interviews for the children. During H.C.'s interview, the child disclosed that petitioner touched her but did not describe where on her body he touched her. The interviewer provided the child with an anatomical drawing of a female body and asked the child to point to where petitioner touched her, and the child pointed to the vaginal area and stated that petitioner touched her "there." The child stated that the touching did not make her feel good and that it had happened on two occasions. During M.C.-3's interview, the then-ten-year-old child initially refused to cooperate, but eventually reported that petitioner touched her vagina. The DHHR reported that M.C.-3 also exhibited concerning behaviors, such as making inappropriate sexual statements and attempting to touch the foster mother's breasts under her shirt.

The circuit court held an adjudicatory hearing on the amended petition in September of 2021. The DHHR first presented the testimony of a CPS worker, who testified that, after removal of the children, M.C.-3 "made a random statement . . . saying [petitioner] f**ked me in the a**hole." Next, a former foster parent testified that, on the first day of M.C.-3's placement in her home, the child told her that petitioner "a**holed" her. The former foster parent further stated that the child exhibited concerning behavior, such as trying to place personal hygiene products into her vagina and constantly touching her vagina. A subsequent foster parent testified that she had placement of M.C.-3 for approximately one month and that the child was frequently angry and would hit the foster parent and call her by T.R.'s last name. The child also tried to touch the subsequent foster parent's breasts.

A forensic interviewer testified as to her interview with M.C.-3, which she described as "somewhat difficult" given the child's distraction. According to the interviewer, M.C.-3 disclosed that petitioner touched her and pointed to her vaginal area. The interviewer acknowledged that the child had developmental delays and provided some nonsensical answers to questions asked. The interviewer also conceded that she could not "guarantee" that the child knew the difference between the truth and a lie. A separate interviewer testified to H.C.'s interview and stated that the child disclosed that petitioner had touched her and pointed to her vaginal area.

H.C.'s foster parent testified that, while in her care, H.C. touched herself and touched the family dog's penis several times. The child also undressed her dolls and touched them in the

vaginal area. The foster parent further stated that, following visits with her parents, the child would urinate on herself and act out. After a few weeks in that placement, H.C. disclosed that her parents touched her and pointed to her vaginal area. H.C.'s second foster parent testified that H.C. made disclosures that her parents touched her "girl parts" and pointed to her vagina. The child specifically described occasions in which she would awaken during the night with her parents in her bed touching her. The foster parent stated that these disclosures occurred "[t]wo to three times, if not more, a week" and that the child disclosed the touching to other people, such as a CPS worker and a doctor. Additionally, the child became very emotional and "shut down" during virtual visits with the parents. According to the foster parent, H.C. would sit in the corner or try to go to the bathroom to "get away" and, towards the end of the visits, she would cry, ball up her fists, and state that she did not want to talk to the parents.

A case manager for H.C.'s foster agency testified that, during a virtual visit she had with H.C. in December of 2020, the child asked to speak to her about her "mean mom and dad." The child reported that her parents touched her and, when the case manager asked her where they touched her, the child became upset and put her head down. After giving the child a few moments, the case manager again asked the child where her parents had touched her, and she pointed to her vagina. The child made identical disclosures to the case manager in April of 2021 and June of 2021. The case manager also corroborated the foster parent's testimony that the child "shut down" during visits with the parents and that she tried to avoid visits by going to the bathroom.

Petitioner presented the testimony of a service provider that worked with M.C.-3. The service provider testified that one of the goals for M.C.-3's treatment program was "the reduction of lying" because the child "has some major issues with telling the truth." For example, the child commented that if she did not get to visit with petitioner, she was going to accuse another staff member of inappropriately touching her. The service provider testified that she never observed M.C.-3 exhibit any sexual behaviors or make any disclosures and noted that the child frequently stated that she missed petitioner.

Petitioner testified that M.C.-2 and M.C.-3 lived with the paternal grandparents for approximately two years before the initiation of the proceedings but claimed that he saw them nearly every weekday and was around on weekends whenever the paternal grandparents needed him. Petitioner denied ever inappropriately touching the children.

The paternal grandmother testified that petitioner and M.C.-2 and M.C.-3 lived in her home for several years and she never observed petitioner touch the children inappropriately. According to the grandmother, petitioner moved out of the home approximately two years prior and M.C.-2 and M.C.-3 remained in her care. The grandmother stated that, during those two years, petitioner never stayed the night at her home and M.C.-2 and M.C.-3 never went to petitioner's home. She indicated that neither child exhibited any sexualized behaviors or reported inappropriate touching.

Following testimony, the circuit court held its ruling in abeyance so that it could review the children's CAC interviews. By order entered on October 24, 2021, the circuit court adjudicated petitioner as an abusing parent. The circuit court found that the DHHR presented clear and convincing evidence that petitioner sexually abused H.C. The circuit court noted that the child made multiple consistent disclosures of sexual abuse to several different people. Further, H.C.'s

4

sexually reactive behaviors were worse during times when she was visiting with her parents, and the behaviors decreased once visits were suspended. The circuit court further found that there was "significant" evidence that petitioner also sexually abused M.C.-3 based upon her multiple disclosures to her CPS worker, her former foster parent, and her CAC interview. The court found that M.C.-3's multiple disclosures diminish any allegation that she was lying about the abuse. The court set the matter for disposition.

The circuit court held a dispositional hearing in November of 2021. The DHHR requested that the court take judicial notice of all the testimony presented at the contested adjudicatory hearing in September of 2021, which it did. Petitioner requested an improvement period but provided no evidence in support of the same. At the conclusion of the hearing, the circuit court denied petitioner's request for an improvement period, finding that he failed to accept "responsibility for the findings of sexual abuse" and that there were no services that could address the sexual abuse of the children or remedy the conditions such that the children could be safely returned to the home. The court further found that petitioner's custody would seriously threaten the welfare of the children. The court reiterated its findings of sexual abuse, which constituted aggravated circumstances, and further found that there were no alternatives to the termination of petitioner's parental rights. Accordingly, the court terminated petitioner's parental rights upon finding that there was no reasonable likelihood that he could correct the conditions of abuse in the near future and that termination of his parental rights was necessary for the children's continuity in care and caretakers. Petitioner appeals the December 3, 2021, dispositional order.[3]

The Court has previously established the following standard of review in cases such as this:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing parent and terminating his parental rights on the basis of sexual abuse. According to petitioner, H.C.'s alleged inconsistent disclosures "plant seeds of doubt as to whether [p]etitioner sexually abused his child." Petitioner argues that H.C.'s CAC interview was long for the child's age.

---

[3]The mothers' parental rights to their respective children were terminated below. The permanency plan for the children is adoption in their respective foster homes.

Further, testimony elicited by the interviewer indicated that there was "research for and against the efficacy of [anatomical] drawings in CAC interviews" and that young children do not have the same range of memory as adults. As such, petitioner avers the DHHR did not meet its burden of proof with regard to H.C. Petitioner argues that, likewise, the DHHR failed to prove that petitioner sexually abused M.C.-3., stating that "the credibility of [her] disclosures was far from sound." Petitioner argues that the interviewer repeatedly asked the same questions of the child, which influenced her disclosures, especially given her developmental delays. Moreover, testimony established that the child had threatened to report a service provider for allegedly touching her in retaliation for not getting to visit with petitioner and that the child had "major issues with telling the truth." As such, given that M.C.-3's "propensity for truthfulness [was] in serious and credible doubt," the court erred in adjudicating him as an abusing parent upon sexual abuse. Petitioner claims that he acknowledged that he failed to properly provide for and supervise his children but states that the evidence of sexual abuse is "woefully shy of being clear and convincing evidence." As such, he concludes that the court erred in adjudicating him and terminating his parental rights.

This Court has previously held that

[a]t the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected . . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id.* at 546, 759 S.E.2d at 777 (citation omitted). "[T]he clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* (citation omitted). Further, West Virginia Code § 49-1-201 defines "abused child" as

[a] child whose health or welfare is being harmed or threatened by . . . [a] parent . . . who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home.

"Physical injury" may include sexual abuse or sexual exploitation. *Id.*

While petitioner argues that the circuit court erred in adjudicating him as an abusing parent, a review of the record reveals that sufficient evidence existed upon which to find that he sexually abused H.C. and M.C.-3 while they were in his custody. The DHHR presented the CAC interviews of the two children in which they reported that petitioner touched their vaginas. The DHHR further presented several witnesses whose combined testimony demonstrated that the children's many disclosures to multiple persons were consistent, and often unprompted, over the course of the proceedings. Petitioner was permitted the opportunity to cross-examine these witnesses (apart from the children) and made arguments regarding any alleged credibility issues or interview

tactics. Moreover, petitioner testified on his own behalf and presented the testimony of other witnesses who testified in his favor.

The circuit court weighed the evidence and found that the children's disclosures of sexual abuse were credible. The circuit court found that the children were abused and adjudicated petitioner accordingly. We have held that "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make some determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997). As such, we decline to disrupt the circuit court's findings concerning the credibility of the children's allegations. Therefore, we find that petitioner was adjudicated upon sufficient evidence and is entitled to no relief in this regard.

We likewise find no error in the circuit court's termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental, custodial, and guardianship rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(d) provides that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "demonstrated an inadequate capacity to solve the problems of abuse or neglect on [his or her] own or with help."

In the instant case, the record establishes that petitioner demonstrated an inadequate capacity to solve the problems of abuse and neglect on his own or with help. Specifically, petitioner failed to accept responsibility for his actions and denied that he sexually abused the children. This Court has held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Moreover, the circuit court found that there were no services that could be offered to remedy the issue of sexual abuse, that the children's safety while in petitioner's custody was threatened, and that the children could never safely be returned to the home. We have previously held that "[c]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child[ren] will be seriously threatened." *Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 4 (citation omitted). Moreover,

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). The evidence set forth above demonstrates that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future and that termination of his parental rights was necessary for the children's welfare. Consequently, we find no error in the circuit court's decision to terminate petitioner's parental rights to the children.

For the foregoing reasons, we find no error in the decision of the circuit court, and its December 3, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: August 31, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn